# United States Court of Appeals
## For the First Circuit

No. 17-1484

UNITED STATES OF AMERICA,

Appellee,

v.

JOEL A. SABEAN, M.D.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Alfred C. Frawley IV, with whom Thimi R. Mina, Jay P. McCloskey, and McCloskey, Mina & Cunniff, LLC, were on brief, for appellant.

Julia M. Lipez, Assistant United States Attorney, with whom Halsey B. Frank, United States Attorney, and Margaret D. McGaughey, Special Assistant United States Attorney, were on brief, for appellee.

March 16, 2018

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA**, **Circuit Judge**.  This case, which reads like an anthology of pain, pathos, and personal degradation, paints a grim picture of the human condition.  It intertwines allegations of an incestuous relationship with criminal charges of tax evasion, unlawful distribution of controlled substances, and health-care fraud.  Following a contentious trial, the jury found defendant-appellant Joel A. Sabean guilty on all of the charged counts.

The defendant strives to convince us, through a wide-ranging asseverational array, that the jury's verdict should not stand.  After careful consideration of a tangled record conspicuously free from prejudicial error, we are not persuaded.  Consequently, we affirm the judgment below.

## I.  BACKGROUND

We sketch the relevant events and travel of the case, reserving a fuller elaboration of the facts for our subsequent discussion of specific issues.  For this purpose, we take the facts in the light most flattering to the jury verdict, consistent with record support.  See United States v. George, 841 F.3d 55, 59 (1st Cir. 2016).

The defendant is a licensed physician, specializing in dermatology, who maintained a lucrative practice in Maine for decades.  Between 2008 and 2013, the defendant sent his adult daughter S.S., who was then a resident of Florida, between $500 and $1,500 daily.  During this interval, the defendant claimed

S.S. as a dependent on his tax returns and represented to the government (as well as to his bookkeeper) that much of this money was tax-deductible because it defrayed S.S.'s medical expenses. See 26 U.S.C. § 213. For instance, the defendant stated at various times that his daughter needed funds to cover costs associated with temporary brain death, tumors, and amputated limbs. These statements were demonstrably false.

The defendant never examined S.S. during the relevant period and, in reality, S.S. never suffered from temporary brain death, tumors, amputated limbs, or the other ailments described by the defendant to his bookkeeper. She squandered much of her father's treasure on drugs, gambling, and gifts for her boyfriend.

The defendant continued sending cash to his daughter even after his wife and office manager complained that he was "hemorrhaging money" and would be unable to afford continued outlays. All told, the defendant sent his daughter over $2,000,000.

There was another dimension to this strange relationship. Between 2010 and 2014, the defendant wrote prescriptions for the anti-depressant drugs Ambien, Lunesta, and Alprazolam (commonly known as Xanax) and transmitted them to pharmacies near his daughter's home. He also wrote and transmitted to Florida pharmacies prescriptions for certain more expensive drugs in the name of his wife Karen, who — unlike S.S. — was

covered by health insurance.  Karen, though, was bedridden and never set foot in Florida during the relevant time period.

The mills of the law sometimes grind slow, but they grind exceedingly fine.  On October 20, 2015, a federal grand jury sitting in the District of Maine charged the defendant, in five counts corresponding to five different tax years, with knowingly evading nearly $1,000,000 in federal tax liability by claiming fraudulent medical deductions between 2009 and 2013.  See 26 U.S.C. § 7201.  The indictment further charged the defendant, in fifty-two counts, with having distributed Ambien, Lunesta, and Xanax to S.S. on fifty-two separate occasions between December 15, 2010 to January 4, 2014 outside the usual course of professional medical practice and without legitimate medical purpose.[1]  See 21 U.S.C. § 841(a)(1); 21 C.F.R. § 1306.04(a).  Finally, the indictment charged the defendant, in a single count, with committing health-care fraud by writing certain prescriptions meant for S.S. in his wife's name between March 28, 2010 and December 9, 2012.  See 18 U.S.C. § 1347.

During elaborate pretrial skirmishing (much of which is irrelevant here), the district court denied the defendant's motion to sever the tax-evasion counts from the drug-distribution and

_____

[1] Some of the drug-distribution counts related to prescriptions written in S.S.'s name, while others related to prescriptions written in Karen's name but intended for S.S.

- 4 -

health-care fraud counts. See United States v. Sabean, No. 2:15-cr-175, 2016 WL 5477569, at *1 (D. Me. Sept. 29, 2016). So, too, the court denied the defendant's motion in limine seeking to exclude S.S.'s testimony regarding alleged sexual abuse.

Trial commenced on November 1, 2016 and lasted nine days (exclusive of jury deliberations). At the close of the government's case-in-chief and again at the close of all the evidence, the defendant moved for judgment of acquittal. See Fed. R. Crim. P. 29(a). The district court reserved decision on these motions. Following jury instruction, the defendant unsuccessfully objected to the district court's charge concerning the drug-distribution counts. After the jury returned an across-the-board guilty verdict, the district court acted on its previous reservation of decision and denied judgment of acquittal. See Fed. R. Crim. P. 29(b), (c). The court thereafter sentenced the defendant to serve concurrent 24-month terms of immurement on the 58 counts of conviction. This timely appeal ensued.

The defendant, ably represented, assails the judgment below on a multitude of grounds. We start with his most loudly bruited argument, which relates to the admission of other-acts evidence concerning the alleged sexual abuse. We then deal with his objections to the district court's exclusion of certain evidence. Once we have disposed of these evidentiary challenges, we turn our attention to a miscellany of other claims.

## II.  THE DISPUTED EVIDENTIARY RULINGS

We subdivide our discussion of the disputed evidentiary rulings into two segments, dealing first with rulings admitting evidence and then with rulings excluding evidence.

### A.  Other-Acts Evidence.

The defendant's flagship claim is that the district court improvidently admitted S.S.'s testimony concerning sexual abuse.  Some context is needed to place this claim into a workable perspective.

S.S., who was 41 years old at the time of trial, testified that she began having intercourse with her father at around age twelve and that they frequently had sex while she was in high school and in the years that followed.  Even after she left Maine and moved to Florida in 2007, she regularly exchanged emails with him detailing sexual fantasies (which they called "lovegrams").  They also had "phone sex."  While S.S. was on the witness stand, the court admitted emails in which the defendant referred to his daughter in terms such as "[d]earest woman who has captivated my being," "hot chick," and "Supreme Sextress."  In one particularly lurid email, the defendant wrote "penis available, blasting zone."  In addition, S.S. testified that the defendant often discussed the possibility of marriage with her and claimed at one point to have procured an engagement ring.

The government asserts that this evidence was admissible as other-acts evidence and was relevant to show the defendant's motive and absence of mistake. As the government sees it, the jury could have inferred that the defendant sent S.S. money and wrote prescriptions for her in order to buy S.S.'s silence about his abuse and to induce her continued participation in their prurient communications. Relatedly, the government asserts that the defendant committed tax evasion and health-care fraud in an effort to offset the exorbitant costs of this scheme.

Although the district court denied the defendant's motion in limine addressed to this testimony, it gave a carefully worded limiting instruction once the witness embarked on this line of testimony. The district court told the jury that the government was offering the testimony "as evidence of what the Government says is the defendant's motive to commit the tax evasion, prescription fraud and health care fraud." Additionally, the court admonished the jury not to "use evidence of a sexual relationship or sexual contact between the defendant and his daughter to infer that because of his character, the defendant carried out the acts charged in this case." The jurors, the court said, were to consider the evidence only for the limited purpose of determining whether the defendant "had a motive or intent to commit the acts charged in the indictment." The court made clear that the jurors could find that the defendant "had sexual contact or a sexual

relationship with his daughter, but still find that the Government has not met its burden of proving that he committed one or all of the crimes charged."

Against this backdrop, we survey the legal landscape. A party may not introduce "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). Evidence of other acts may, though, be admissible for certain specific purposes. See id. When an objection is interposed, a proffer of such evidence is subject to a threshold inquiry: the trial court must determine whether "the finder of fact 'can reasonably conclude that the act occurred and that the defendant was the actor.'" United States v. Raymond, 697 F.3d 32, 38 (1st Cir. 2012) (quoting United States v. Huddleston, 485 U.S. 681, 689 (1988)). If the answer to this threshold inquiry is in the affirmative, the court next must determine "whether the evidence submitted 'is probative of a material issue other than character.'" Id. (quoting Huddleston, 485 U.S. at 686). Put another way, other-acts evidence must have "special relevance to an issue in the case," such as motive, intent, absence of mistake, or knowledge. Id. (quoting United States v. Varoudakis, 233 F.3d 113, 118 (2000)).

A finding of special relevance is a necessary — but not a sufficient — precondition for the admissibility of other-acts

evidence.  Rule 404(b) "incorporates sub silentio the prophylaxis of Federal Rule of Evidence 403."  United States v. Sebaggala, 256 F.3d 59, 67 (1st Cir. 2001).  It follows that even if other-acts evidence is specially relevant, the trial court may exclude that evidence if its probative value is substantially outweighed by potential evils such as unfair prejudice, jury confusion, or waste of time.  See Fed. R. Evid. 403.  Where, as here, objections to other-acts evidence have been preserved, our review of rulings admitting or excluding such evidence is for abuse of discretion. See Raymond, 697 F.3d at 36; Varoudakis, 233 F.3d at 118.

The logical starting point for our inquiry in this case is the district court's conclusion that the evidence was sufficient to support a finding that the defendant sexually abused his daughter.  As we have explained, "[w]hen the relevancy of evidence is conditioned on the establishment of a fact" — here, the fact that the defendant sexually abused S.S. — "the offering party need only introduce sufficient evidence to permit a reasonable jury to find the conditional fact by a preponderance of the evidence to establish that the evidence is relevant."  United States v. Balthazard, 360 F.3d 309, 313 (1st Cir. 2004); see United States v. Trenkler, 61 F.3d 45, 53 (1st Cir. 1995).  On this point, the defendant argues that no sufficient foundation was laid because S.S.'s testimony was incredible.  He suggests that no reasonable juror could have believed S.S. in light of her history of

committing perjury and engaging in other dishonest acts, and adds that no other basis existed on which to find that sexual abuse transpired.

This argument is dead on arrival. With only narrow exceptions not pertinent here, credibility determinations are left to the wisdom of the jury. See United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000); see also United States v. Scheffer, 523 U.S. 303, 313 (1998) (plurality opinion) (explaining that "the jury is the lie detector"). Thus, when a jury trial is underway, the court lacks the authority "to exclude evidence on the basis of [its] own belief as to the persuasiveness of that evidence." Blake v. Pellegrino, 329 F.3d 43, 47 (1st Cir. 2003). Although the jury in this case was presented with several reasons that might have led it to discredit S.S.'s testimony,[2] it was the jury's prerogative not to do so. After all, the jury's right to judge the credibility of witnesses is not restricted to circumstances in

---

[2] For instance, S.S. admitted to having "had a problem with lying [her] whole life"; she had a prior conviction for shoplifting; and she served a six-month sentence for dissembling to her probation officer. In addition, S.S.'s friend, Dezerra Tsai, testified that she once heard S.S. admit to having fabricated the sex-abuse allegations.

Relatedly, we note that in his brief, the defendant refers to a letter that S.S. purportedly authored several weeks after trial, in which she is alleged to have apologized for her testimony. Because this letter was not introduced at trial, it does not warrant consideration in connection with any of the issues developed in the defendant's appellate briefing. See United States v. Carrasco-De-Jesús, 589 F.3d 22, 27-28 (1st Cir. 2009).

which the witness's testimony is flawless in every respect. See Alicea, 205 F.3d at 483. We conclude, therefore, that S.S.'s testimony, combined with the exhibits memorializing the salacious father-daughter correspondence, comprised a sufficient basis for a reasonable jury to find that the defendant had sexually abused his daughter.

This brings us to the question of whether the other-acts evidence has special relevance to any disputed issue in the case. Evidence has "special relevance" when "it tends to prove a material fact apart from a mere propensity to behave in a certain way." United States v. Watson, 695 F.3d 159, 165 (1st Cir. 2012). A prime example of special relevance, pertinent here, is when evidence of other-act evidence is introduced "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." United States v. Goyner, 761 F.3d 157, 163 (1st Cir. 2014) (quoting United States v. D'Alora, 585 F.2d 16, 20 (1st Cir. 1978)). Such evidence may be particularly helpful when an actor's state of mind is at issue "and the only means of ascertaining that mental state is by drawing inferences from conduct." Huddleston, 485 U.S. at 685.

Here, it is nose-on-the-face plain that the defendant's state of mind was a highly material and hotly disputed issue. All of the charged crimes required proof of scienter. See 26 U.S.C. § 7201; 21 U.S.C. § 841(a)(1); 18 U.S.C. § 1347. Moreover,

- 11 -

the bedrock of the defense was that the defendant truly believed that S.S. needed both the money and the extensive medical treatment that he described.

In an effort to change the trajectory of the debate, the defendant suggests that evidence of abuse was not probative of his intent to commit the charged crimes. This suggestion relies on the assertion that S.S. never provided direct testimony that sexual abuse was the reason for either the cash outlays or the bogus prescriptions; indeed, he collects snippets from the transcript in which she "testified to the contrary." In support of this suggestion, the defendant points out that S.S. indicated that she had never threatened to expose the incestuous relationship if her father stopped sending money and drugs. And at another point, S.S. said that the cash and drugs were not meant "to keep [her] quiet" but, rather, were meant to keep her "happy and comfortable."

This suggestion misapprehends both the record and the law. With respect to the record, the defendant glosses over other testimony by S.S. that contravenes his synthesis of the transcript. By way of example, S.S. testified that there was an implied understanding between father and daughter that he would send her money and drugs so that she would engage in sexualized communications with him. S.S. also testified that her father threatened to cause her "big problems" and "cut [her] off" if she ever revealed his sexual abuse. Fairly viewed, S.S.'s testimony

- 12 -

was a mixed bag — and it is apodictic that a jury may "credit some parts of a witness's testimony and disregard other potentially contradictory portions."  Alicea, 205 F.3d at 483.

With respect to the law, the infirmities of the defendant's argument are even more pronounced.  Criminal defendants rarely shout their nefarious intentions from the rooftops.  Here, the government was not required to introduce direct evidence connecting the defendant's disbursements of money and drugs to the incestuous relationship.  Circumstantial evidence can suffice to forge such a link, and this jury had the right to infer motive or absence of mistake based on common-sense inferences drawn from evidence of the attendant circumstances.  See, e.g., United States v. Cole, 631 F.3d 146, 155-56 (4th Cir. 2011); United States v. Sampson, 980 F.2d 883, 887-88 (3d Cir. 1992).

Because our society abhors incestuous sexual abuse, the jury reasonably could have concluded that a perpetrator would be willing to pay a very steep price to buy the victim's silence. The jury likewise could have inferred, as a matter of common sense, that the defendant's desire to continue prurient communications with his daughter provided "at least some incentive" for his continued disbursements of cash and drugs.  United States v. Potter, 616 F.2d 384, 387-88 (9th Cir. 1979) (finding evidence that physician had sex with patient and simultaneously prescribed

drugs for her sufficient to support inference that sexual favors motivated prescriptions).

Let us be perfectly clear. We recognize that the defendant's behavior was very far from the norm. But though (or perhaps because) that behavior was outrageous, proof of it was necessary to paint an accurate picture of what was transpiring. Without admission of the other-acts evidence, the jury would have been left with an incomplete picture as to why the defendant would funnel millions of dollars to his daughter despite warnings that he was hemorrhaging money, why he would tell his bookkeeper that the funds were for medical conditions that his daughter never experienced, and why he would prescribe highly addictive drugs in large quantities to a person with a drug habit without conducting anything resembling a medical examination of the putative patient. Telling the tale of this case without referring to sexual abuse would be like telling the tale of Abraham Lincoln's assassination at the hands of John Wilkes Booth without mentioning either the Civil War or the Emancipation Proclamation. The jury was entitled to the full picture, and we therefore conclude that the district court's determination of special relevance was within the encincture of its discretion. See Gonyer, 761 F.3d at 163 (approving admission of sex-abuse evidence without which the jury "would have been presented with an incomplete picture" of defendant's state of mind).

This conclusion does not end our odyssey. Even if the other-acts evidence was probative and specially relevant, the defendant says that it should have been excluded as prejudicial. The question, though, is not prejudice simpliciter. Virtually all evidence is meant to be prejudicial, and Rule 403 only guards against unfair prejudice. See United States v. Winchenbach, 197 F.3d 548, 559 (1st Cir. 1999); United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989).

The Supreme Court has described unfair prejudice in terms of "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). Once a trial judge rejects a challenge based on Rule 403 and admits other-acts evidence that is both probative and specially relevant, appellate review is subject to a high bar: "[o]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Winchenbach, 197 F.3d at 559 (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)). Since jurors are presumed to abide by the trial court's directions, see Richardson v. Marsh, 481 U.S. 200, 206 (1987), we are especially reluctant to find that the admission of relevant evidence constitutes an abuse

- 15 -

of discretion where, as here, the trial court has given "suitably prophylactic instructions," United States v. Mehanna, 735 F.3d 32, 64 (1st Cir. 2013).

We do not gainsay that, in this case, a meaningful danger of unfair prejudice lurked. The admission of evidence that the defendant began sexually abusing his daughter when she was quite young and persisted in that abuse for many years surely carried a potential risk of inflaming the jury. Cf. United States v. Hands, 184 F.3d 1322, 1328 (11th Cir. 1999) (noting that domestic abuse is "particularly 'likely to incite a jury to an irrational decision'" (citation omitted)). Even so, the defendant's state of mind was a crucial issue, and the challenged evidence was not only relevant to that issue but also significantly probative of motive and absence of mistake. When the weighing of relevance and unfair prejudice results in mere equipoise, "Rule 403 tilts the balance in favor of admission." United States v. Whitney, 524 F.3d 134, 141 (1st Cir. 2008) (quoting United States v. Rivera, 83 F.3d 542, 545 (1st Cir. 1996)). Tilting the balance in the same direction are the cautionary instructions skillfully employed by the district court, which mitigated any risk of unfair prejudice. See Mehanna, 735 F.3d at 64. Considering the totality of the circumstances and the deference due to the district court's on-the-spot judgment, we hold that the admission of other-acts

evidence regarding the defendant's sexual abuse of his daughter was within its discretion.

### B. Other Disputed Evidentiary Rulings.

The defendant also challenges a variety of other evidentiary rulings. Because his objections were preserved below, our review is for abuse of discretion. See United States v. Walker, 665 F.3d 212, 228 (1st Cir. 2011).

1. **The Audiotape.** The defendant assigns error to the district court's exclusion of an audiotape of S.S.'s 2016 testimony before a Florida court, which contained a series of misstatements. The audiotape would have confirmed that S.S. provided a Florida probation officer with false documentation of her community service and lied under oath that her son had been paralyzed as a result of an automobile accident. It also captured S.S.'s statement of her intention to appear as a "key witness against" the defendant in the criminal trial. While the district court permitted the defendant to cross-examine S.S. about this testimony, it sustained the government's objection when the defendant sought to introduce the audiotape itself into evidence.[3]

The defendant asseverates that the audiotape would have shown — far more powerfully than cross-examination — S.S.'s "motive

---

[3] The district court simultaneously rejected the defendant's proffer of a transcript of the audiotape. Although we refer only to the audiotape, our reasoning applies with equal force to the exclusion of the transcript.

to lie about her father" and her "pattern of lying about her family in order to deflect blame from herself onto others."  This asseveration runs headlong into Federal Rule of Evidence 608(b), which prohibits "the introduction of[] extrinsic evidence of specific instances of a witness's misconduct if offered to impugn [her] credibility."  Winchenbach, 197 F.3d at 558 (emphasis removed).  The district court determined that the audiotape comprised extrinsic evidence of particular instances of prevarication that were probative only of S.S.'s penchant for truthfulness.  That determination fell comfortably within the scope of the district court's discretion.

Relatedly, the defendant posits that the audiotape was evidence relevant to material (rather than collateral) issues.  In his view, S.S.'s testimony played such an important role in the trial that the admissions in the audiotape were "fact[s] of consequence" and, thus, not subject to the bar constructed by Rule 608(b).  This argument overlooks that the "facts" were before the jury through cross-examination of S.S.  Perhaps more importantly, this argument reflects a misunderstanding of the applicable law.

A matter is collateral if evidence relating to it could only have been introduced for the purpose of impeachment.  See United States v. Schuler, 458 F.3d 1148, 1155 (10th Cir. 2006).  Viewed in isolation, the contents of the audiotape had no direct bearing on any element of a claim or defense cognizable in the

- 18 -

criminal case. Rather, the audiotape was relevant only for the limited purpose of impeaching S.S.'s character for truthfulness. The fact that S.S.'s testimony played a significant role in the case does not alter this reality.

The defendant assays two fallback arguments. First, he argues that the audiotape was admissible to impeach the government's opening statement. To be specific, the government indicated in its opening statement, without objection, that S.S. would disclose the defendant's sexual abuse "for the first time in public." The audiotape, the defendant says, would have revealed that S.S. testified about the sexual abuse publicly on an earlier occasion.

This argument lacks force. The Evidence Rules permit impeachment of both witnesses and out-of-court declarants whose statements are admitted into evidence. See Fed. R. Evid. 607, 806. Without more, though, a prosecutor is neither a witness nor a declarant, and his opening statement is not evidence. See, e.g., United States v. Lopez, 649 F.3d 1222, 1237 (11th Cir. 2011).

In the defendant's view, however, there is more to the question. He argues that in this instance, the prosecutor opened the door to rebuttal of this particular statement. But this argument does not gain him any traction: the fact that S.S. had previously testified concerning sexual abuse bore no relevance to any cognizable claim or defense. And in any event, rebuttal became

unnecessary because S.S. never adopted the prosecutor's characterization while testifying; she did not deny having previously testified regarding the sexual abuse.

The defendant's second fallback argument is even more of a stretch. He suggests that the audiotape was admissible as evidence of bias. A witness's testimony may be relevant to bias when it pertains to her "like, dislike, or fear of a party" or "self-interest." United States v. Abel, 469 U.S. 45, 52 (1984). Although extrinsic evidence sometimes may be admitted to prove bias, see id., the defendant's theory is flatly belied by the audiotape itself, which contains no statements relevant to bias save for S.S.'s allegation of child molestation. Since this allegation was entirely consistent with S.S.'s protracted trial testimony concerning past sexual abuse, it was well within the district court's discretion to exclude it as cumulative. See Hamling v. United States, 418 U.S. 87, 127 (1974); Fed. R. Evid. 403.

2. **The $10,000,000 Check.** The defendant challenges the exclusion of testimony from a bank teller to the effect that, two decades earlier, the defendant tried to deposit a forged $10,000,000 check. Some additional facts are necessary to put this claim of error into perspective.

S.S. testified that, on October 9, 1995, she gave her father a check purporting to be "income" from an apocryphal person

- 20 -

for an apocryphal business. She characterized this gift as a "birthday gag." Over the government's objection, the district court admitted a copy of the check into evidence. The court nonetheless excluded as cumulative the defendant's subsequent proffer of testimony from a bank teller who would have said that the defendant attempted to deposit the check some four months later.

Rule 403 authorizes exclusion of evidence when the probative value of that evidence is substantially outweighed by the problems caused by "needlessly presenting cumulative evidence." Trial courts enjoy "considerable latitude" to exclude evidence that is "admittedly relevant" but also "cumulative." Hamling, 418 U.S. at 127.

Here, the defendant argues chiefly that the bank teller's testimony would have evinced his "mental impairments" and susceptibility to S.S.'s "deception." But the alleged deposit attempt took place over a decade before the commission of any of the charged crimes, so the bank teller's testimony had little probative value.

In any event, the defendant introduced a myriad of other evidence concerning his mental health, including expert testimony from a noted psychiatrist that he exhibited symptoms suggesting a personality or delusional disorder, which made it impossible for him to refuse S.S.'s importunings. Seen in this light, we think

that the district court acted within its discretion in concluding that the probative worth of the bank teller's testimony was substantially outweighed by the danger of needlessly presenting cumulative evidence regarding the defendant's mental capacity. See id.; see also Fed. R. Evid. 403.

**3. The 2005 Emails.** The defendant challenges the exclusion of two emails that he transmitted to S.S. in 2005. In these emails, the defendant complained about S.S.'s profligate spending habits and threatened to stop sending her money. The defendant submits that, if admitted, the emails would have shown that he intended to dry up the flow of funds to S.S. for reasons unrelated to sexual abuse. In this way, he says, they would have undercut the government's theory regarding motive and absence of mistake.

The defendant's claim of prejudicial error is untenable. It is common ground that a declarant's out-of-court statement is inadmissible if it is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The threats contained in the 2005 emails were therefore inadmissible to prove that the defendant intended to withhold funds from S.S. because of her thriftless spending unless an exception to the hearsay bar applies.

To this end, the defendant nonetheless insists that the Rule 803(3) hearsay exception applies. He is mistaken.

Rule 803(3) exempts from the hearsay bar statements exhibiting a declarant's "then-existing state of mind." But the exception is not "a sweeping endorsement of all state-of-mind evidence." Colasanto v. Life Ins. Co. of N. Am., 100 F.3d 203, 212 (1st Cir. 1996). To be admissible, the declaration "must 'mirror a state of mind, which, in light of all the circumstances, including proximity in time, is reasonably likely to have been the same condition existing at the material time.'" Id. (citation omitted); see Mut. Life Ins. Co. of N.Y. v. Hillmon, 145 U.S. 285, 294-95 (1892). In this instance, the emails were written several years before the occurrence of the conduct underlying the charged crimes. Given this temporal gap, the district court did not abuse its discretion in finding the Rule 803(3) exception unavailable.

The defendant argues, in the alternative, that the emails were admissible for a different purpose. If this argument holds water, the hearsay bar can be avoided: as long as the significance of an out-of-court declarant's "statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." United States v. DeCologero, 530 F.3d 36, 58 (1st Cir. 2008) (citation omitted). Building on this foundation, the defendant suggests that the emails were admissible to prove that he intended to cut S.S. off financially for reasons unrelated to sexual abuse.

In the end, we need not decide whether the district court's rejection of this alternative argument was erroneous. Even assuming arguendo that the emails could be admitted for a non-hearsay purpose, any error was patently harmless. When, as now, an alleged error is not of constitutional dimension, we may affirm a conviction so long as we have "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Melvin, 730 F.3d 29, 39 (1st Cir. 2013) (quoting United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012)). When analyzing harmlessness in this context, we "mull the [evidentiary] ruling in context, giving due weight to the totality of the relevant circumstances." United States v. Wilkerson, 251 F.3d 273, 280 (1st Cir. 2001) (citation omitted).

Because the root of the harmless error inquiry is whether the evidence would likely have affected the outcome of the trial, see United States v. Torres-Galindo, 206 F.3d 136, 141 (1st Cir. 2000), we focus on the net impact of the two emails. In one of them, the defendant referenced the "180,000 dollars of after tax money" S.S. had "pissed away." In the other, the defendant warned S.S. that she was not "entitled to a free lunch at the family's expense all the time" and told her not to call him about it. "If you call," he cautioned, "Mom will know the extent of your 'abuse' financially."

- 24 -

In the context of this case, these statements had as much of a tendency to inculpate the defendant as to exonerate him; the reference to "after tax money" suggests that the defendant knew the funds were not tax-deductible, and the use of "abuse" in quotes can easily be read as acknowledging the leverage that S.S. held over her father. And although the emails also can be read as supporting the defense's theory — that the defendant was willing to cut S.S. off regardless of whether she kept quiet about the abuse — the fact is that he kept paying. Given this bubbling caldron of conflicting inferences, we think it apparent that the net impact of the evidence was likely a wash, and, therefore, its exclusion was harmless.

## III. THE REMAINING CLAIMS OF ERROR

With the disputes over evidentiary issues resolved, a trio of claims remains. Each of these claims attacks the verdict from a different angle. We address these claims one by one, taking them in the order in which they arose below.

### A. Severance.

The defendant maintains that the district court erred in refusing to sever the tax-evasion counts. In a criminal case, severance has two dimensions. One dimension is joinder: the government may, in a single indictment, charge a defendant with separate crimes that "are of the same or similar character, or are based on the same act or transaction, or are connected with or

- 25 -

constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). For this purpose, "'similar' does not mean 'identical.'" United States v. Edgar, 82 F. 3d 499, 503 (1st Cir. 1996) (quoting United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980)). Our appraisal of similarity is forward-looking, not backward-looking; we assess the similarity of the charges based on what the government reasonably anticipated proving when the charges were lodged, not on what a post-hoc autopsy of the trial transcript might suggest. See id.; United States v. Natanel, 938 F.2d 302, 306 (1st Cir. 1991).

Rule 8(a) creates "a generous presumption in favor of joinder," and we review the propriety of joinder de novo. United States v. Monteiro, 871 F.3d 99, 107 (1st Cir. 2017). In weighing a claim of misjoinder, we take into account factors such as "whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred." United States v. Taylor, 54 F.3d 967, 973 (1st Cir. 1995).

Misjoinder is not the only basis on which a motion for severance may be granted. Severance is also authorized under the aegis of Federal Rule of Criminal Procedure 14. This latter rule permits severance when a defendant makes a showing that joinder, though compliant with the strictures of Rule 8(a), is nonetheless so prejudicial as to deprive him of a fair trial. See United

States v. Richardson, 515 F. 3d 74, 81 (1st Cir. 2008). We review the denial of a motion for severance on Rule 14 grounds for abuse of discretion. See Taylor, 54 F.3d at 974.

In the case at hand, the defendant asserts — as he did below — that tax-evasion charges may be joined with non-tax counts only when the unreported income underlying the former consists of proceeds from crimes underlying the non-tax counts. To buttress this assertion, he points to cases such as United States v. Randazzo, in which we recognized that "false statement claims" may be joined with tax-evasion charges "where the tax fraud involves failure to report specific income obtained by the false statements." 80 F.3d 623, 627 (1st Cir. 1996); see United States v. Yefsky, 994 F.2d 885, 895 (1st Cir. 1993) (holding that "tax fraud and mail fraud counts could be joined because some of the unreported income was the fruit of the mail fraud scheme").

The defendant, however, reads our case law through rose-colored glasses, and we reject his attempt to transmogrify a sufficient condition for the joinder of tax and non-tax charges into a necessary condition. Here, the alleged tax-evasion and drug-distribution offences took place in roughly the same time frame, and the government reasonably could have anticipated when it secured the indictment that the disposition of all of the charges would hinge on common factual issues (including S.S.'s health, prescription history, record of treatment, and

relationship with her father). This temporal and factual commonality weighs heavily in favor of allowing joinder. See Taylor, 54 F.3d at 973. To cinch the matter, the government had a solid basis for anticipating that it would be able to prove that all of the charged counts (tax evasion, drug distribution, and health-care fraud) emanated from a single plan to conceal the defendant's past sexual abuse and keep his daughter engaged in salacious communications while minimizing the net cost of providing the drugs and hush money. Given this panoply of facts, we hold that all of the counts were lawfully joined under Rule 8(a).

The defendant's plea for severance under Rule 14 fares no better. That plea is anchored in the notion that severance was necessary to prevent prejudicial spillover from S.S.'s allegations of sexual abuse. The theoretical premise on which this notion rests is sound: severance may be appropriate when "proof that defendant is guilty of one offense may be used to convict him of a second offense, even though such proof would be inadmissible in a second trial for the second offense." Richardson, 515 F.3d at 81 (quoting United States v. Jordan, 112 F.3d 14, 16 (1st Cir. 1997)).

Here, however, the conclusion that the defendant seeks to draw from this premise does not follow. The court below found that S.S.'s allegations of sexual abuse were relevant to all of

the charges laid in the indictment, and that finding cannot plausibly be termed an abuse of discretion. Consequently, the defendant's allegation of prejudicial spillover is without substance. See id.

To say more about either joinder or severance would be supererogatory. For the reasons articulated above, we conclude that the defendant has neither rebutted the strong presumption in favor of joinder nor mounted a compelling showing of undue prejudice. It follows inexorably, as night follows day, that the district court's refusal to sever the tax-evasion charges is impervious to the defendant's onslaught.

## B. **Jury Instructions.**

The defendant next challenges the district court's jury instructions on the drug-distribution counts.[4] This claim of error was preserved below, and we follow a two-part framework in reviewing preserved claims of instructional error. See Sasso, 695 F.3d at 29. Under this bifurcated framework, we afford de novo review to questions about "whether the instructions conveyed the essence of the applicable law," while affording review for abuse of discretion to questions about "whether the court's choice of language was unfairly prejudicial." Id. In this instance, the

---

[4] A copy of the relevant portion of the jury instructions is reprinted as an appendix.

- 29 -

parties agree that de novo review obtains, and we proceed accordingly.

When charging a jury, a district court's task is to "furnish a set of instructions composing, in the aggregate, the proper legal standards to be applied by lay jurors in determining the issues that they must resolve in a particular case." United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995). On appeal, we are obliged to consider the district court's instructions in their totality, "not in some sort of splendid isolation." United States v. Goris, 876 F.3d 40, 48 (1st Cir. 2017).

Since the defendant's claim of instructional error relates exclusively to the drug-distribution counts, we start by summarizing the relevant legal standards pertaining to convictions under the Controlled Substances Act. That Act makes it "unlawful for any person knowingly or intentionally" to "distribute . . . a controlled substance." 21 U.S.C. § 841(a); see United States v. Limberopoulos, 26 F.3d 245, 249 (1st Cir. 1994). A registered physician is exempt from this prohibition, though, if he prescribes controlled substances in the usual course of professional practice.[5] See 21 U.S.C. § 822(b); 21 C.F.R. § 1306.04(a). This

---

[5] The term "registered physician" is a term of art. The law requires physicians wishing to prescribe medications that are deemed controlled substances to register with the Attorney General. See 21 U.S.C. § 822(a)(2); Hoxie v. Drug Enf't Admin., 419 F.3d 477, 481 (6th Cir. 2005). It is undisputed that the defendant was so registered.

exemption does not shield a physician who knowingly dispenses controlled substances outside "the usual course of professional treatment or . . . legitimate and authorized research." 21 C.F.R. § 1306.04(a); see United States v. Moore, 423 U.S. 122, 124 (1975). Thus, a physician violates Section 841(a) when he writes controlled-substance prescriptions not in service of treating a patient but, rather, in service of enabling a known drug addiction. See United States v. Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994).

In this case, the defendant trains his fire on the district court's instructions concerning the mens rea requirement of the drug-distribution offenses. He contends that the district court's references to a physician's "course of professional practice" and "standard of care" were apt to have confused the jury, with the result that the jury could have found the defendant guilty on the drug-distribution counts for engaging in negligent (as opposed to intentional) misconduct.

This contention is groundless. We agree, of course, that a physician's departure from the standard of care, without more, is not enough to sustain a conviction under Section 841(a). See United States v. Wexler, 522 F.3d 194, 204 (2d Cir. 2008); United States v. Feingold, 454 F.3d 1001, 1007 (9th Cir. 2006). We also agree that even a negligent physician is inoculated against criminal liability under Section 841(a) as long as he acts in good faith. See United States v. McIver, 470 F.3d 550, 559-60 (4th

- 31 -

Cir. 2006). But acts or omissions may still be relevant to the jury's decisional calculus even if, on their own, they cannot dictate a finding of guilt.

So it is here: although a physician's failure to adhere to an applicable standard of care cannot, by itself, form the basis for a conviction under Section 841(a), such a failure is undeniably relevant to that determination. See Wexler, 522 F.3d at 204. After all, the further that a defendant strays from accepted legal duties, the more likely that a factfinder will find him to be in knowing disregard of those duties. See Cheek v. United States, 498 U.S. 192, 203-04 (1991). With such a predicate in place, a jury supportably may conclude "that the government has carried its burden of proving knowledge." Id. "Evidence that a physician consistently failed to follow generally recognized procedures tends to show that in prescribing drugs he was not acting as a healer but as a seller of wares." United States v. Alerre, 430 F.3d 681, 691 (4th Cir. 2005).

The district court's instructions hewed closely to these principles and articulated them well. The court made pellucid that, although facts such as a physician's failure to meet the standard of care or to adhere to ethical standards were relevant data points, medical negligence alone was insufficient to ground a conviction. Rather, the government was required to prove beyond a reasonable doubt that the defendant had written a

"prescription for other than a legitimate medical purpose in the usual course of professional practice."  It is axiomatic that instructing a jury that the government must meet its burden of proof "beyond a reasonable doubt" clarifies that a criminal, rather than a civil, standard applies.  McIver, 470 F.3d at 559.

The coup-de-grâce is that the district court lucidly explained the government's burden for proving criminal intent.  It stressed that the government had to prove, at a minimum, that the defendant "was aware to a high probability the prescription was not given for a legitimate medical purpose in the usual course of professional practice" and that the defendant "consciously and deliberately avoided learning that fact."  Cf. Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 766 (2011) (explaining doctrine of willful blindness).

Nor was this all.  To safeguard the defendant's rights, the court emphasized that "a sincere effort to act in accordance with proper medical practice," even if flawed, could not undergird a guilty verdict so long as the defendant had acted in "good faith."  This latter instruction was important.  Because good faith is a defense to criminal charges under Section 841(a) but not to civil liability for medical malpractice, "inclusion of a good faith instruction is . . . a plainspoken method of explaining to the jury a critical difference between the two standards."  United

- 33 -

States v. Smith, 573 F.3d 639, 650 (8th Cir. 2009) (quoting McIver, 470 F.3d at 560).

The defendant has one last shot in his sling. He notes that he proposed alternative language, spurned by the district court, which would have better illustrated the distinction between criminal distribution of drugs and medical malpractice. This observation goes nowhere. Although a trial court is required to convey the proper legal standards in its jury instructions, its word choices as among acceptable formulations are largely discretionary. See DeStefano, 59 F. 3d at 2; see also United States v. Sampson, 486 F.3d 13, 38 (1st Cir. 2007) (holding that court was not obliged to "parrot [defendant's] preferred wording in its jury instructions"). On appeal, the issue is not whether the district court's choice of phrase was ideal but, rather, whether "taking the charge as a whole, the instructions adequately illuminate[d] the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury." DeStefano, 59 F.3d at 3 (internal citations omitted). The court's charge in this case passes this test with flying colors.

That ends this aspect of the matter. The luminously clear language adopted by the district court belies the defendant's suggestion that the district court failed to convey the proper mens rea requirement to the jury. Viewing the jury instructions as a whole, we conclude that the district court adequately

elucidated the distinctions between intentional and negligent misconduct. Accordingly, we reject the defendant's claim of instructional error.

## C. **Judgment as a Matter of Law.**

We need not tarry over the defendant's final argument, which calumnizes the district court's denial of his motions for judgment of acquittal on the drug-distribution charges. In approaching this argument, we are mindful that we review the denial of a motion for judgment of acquittal de novo. See George, 841 F.3d at 61. For this purpose, we evaluate whether, after considering the evidence in the light most favorable to the government and drawing all reasonable inferences to its behoof, a rational jury could conclude that the government proved all of the essential elements of the charged crimes beyond a reasonable doubt. See id.; United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012). "To uphold a conviction, the court need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in 'a plausible rendition of the record.'" United States v. Williams, 717 F.3d 35, 38 (1st Cir. 2013) (quoting United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993)).

The defendant does not challenge the sufficiency of the evidence with respect to the health-care fraud count — a count that addressed the prescriptions fraudulently written in his

wife's name.  Rather, he limits his sufficiency challenge to the drug-distribution counts relating to the prescriptions written in S.S.'s name.  With respect to those counts, the government had to establish beyond a reasonable doubt that the defendant "knowingly prescribed a controlled substance outside the usual course of professional medical practice and without a legitimate medical purpose."  United States v. Kohli, 847 F.3d 483, 489 (7th Cir. 2017); see 21 U.S.C. § 841(a)(1); 21 C.F.R. § 1306.04(a).  The defendant does not dispute that Ambien, Lunesta, and Xanax are Schedule IV controlled substances, nor does he dispute that he was aware of their status as such.  Even so, he contends that a rational jury could not have found that he wrote the prescriptions in S.S.'s name for illegitimate purposes.

This contention elevates hope over reason.  There is no pat formula describing what proof is required to ground a finding that a defendant acted outside the usual course of professional practice.  See United States v. Singh, 54 F.3d 1182, 1187 (4th Cir. 1995); United States v. August, 984 F.2d 705, 713 (6th Cir. 1992).  Rather, inquiring courts must approach the issue on a case-by-case basis and sift the evidence in a given case to determine whether a specific set of facts will support a guilty verdict. See Singh, 54 F.3d at 1187.  In conducting this tamisage, testimony from a medical or pharmacological expert may be helpful — but such expert testimony is not a sine qua non to a finding of guilt.  See

United States v. Elder, 682 F.3d 1065, 1070 (8th Cir. 2012) (holding that in such a case the jury may also base a guilty verdict on lay testimony concerning the facts and circumstances relating to the prescriptions); United States v. Pellman, 668 F.3d 918, 924 (7th Cir. 2012) (similar).

Jurors, of course, may draw on their everyday experiences, and they can be expected to have some familiarity with how doctors care for patients. It follows, we think, that jurors may infer bad faith from conduct that is commonly understood to be plainly unprofessional. For instance, a physician's prescription of an addictive drug without any physical examination may provide support for an inference of bad faith. See Moore, 423 U.S. at 142-43; United States v. Johnson, 71 F.3d 539, 542 (6th Cir. 1995). Similarly, a physician's prescription of controlled substances to a person, knowing of that person's drug addiction, also may be probative of bad faith. See Kohli, 847 F.3d at 490; see also United States v. Hooker, 541 F.2d 300, 305 (1st Cir. 1976) (affirming conviction of physician who "knew the drugs were not to be used for therapeutic or medical purposes" (citation omitted)). So, too, a physician's failure to maintain adequate patient records when prescribing addictive drugs may be probative of bad faith. See Elder, 682 F.3d at 1071.

In this case, the record reflects several badges of bad faith. The defendant prescribed a surfeit of highly addictive

drugs even though he never examined S.S. during the relevant time frame and knew of her history of drug abuse. Moreover, the trial transcript contains no hint that the defendant ever maintained records of S.S.'s treatment. Even more damning, the government's expert, Dr. Gary Hatfield, testified that the prescriptions at issue fell outside the ethical boundaries of patient care.[6] Last — but surely not least — the jury reasonably could have inferred (as explained supra) that the defendant prescribed the drugs in order to buy S.S.'s silence and her continued participation in sexualized communications, and not for any legitimate medical purpose.

In another effort to disparage the sufficiency of the evidence, the defendant claims that he suffered from a personality

---

[6] Among other things, Dr. Hatfield testified that, in accordance with standard medical practice, only a physician treating a patient locally should prescribe addictive drugs on a routine basis. He also vouchsafed that physicians should not treat family members in non-emergency situations. Finally, he offered his opinion that a dermatologist lacks the necessary qualifications to write prescriptions for anti-anxiety and anti-depressant drugs on a long-term basis.

To be sure, the defendant attempts to debunk the probative value of Dr. Hatfield's testimony because that testimony was not based on a review of S.S.'s patient files and, therefore, the witness was in no position to second-guess the defendant's medical judgment. This is magical thinking: where, as here, there is no evidence that the physician-defendant kept any records relating to the patient, that vacuum "cast[s] serious doubt on whether any legitimate doctor-patient relationships existed." Elder, 682 F.3d at 1071. The defendant's thesis, if accepted, would have the perverse consequence of rewarding unscrupulous physicians who avoid leaving a paper trail.

disorder that prevented him from resisting S.S.'s importunings. Refined to bare essence, this claim boils down to an invitation that we weigh conflicting state-of-mind evidence differently than the jury chose to do. We must decline the invitation: since the jury's determination that the defendant engaged in intentional misconduct is amply supported by a plausible reading of the record, we must honor that determination. See Williams, 717 F.3d at 38.

We summarize succinctly. Congress gave the defendant the authority to distribute dangerous and addictive drugs. With that grant of authority, Congress also gave "him the responsibility to distribute them wisely within the course of his medical practice." Singh, 54 F.3d at 1189. On the ugly facts of this case, the jury reasonably could have inferred — as this jury did — that the defendant abused this grant of authority and that his conduct fell so far below professional standards that his actions must have been driven by illegitimate purposes. Consequently, the evidence was sufficient to sustain his conviction on the challenged drug-distribution counts.

## IV. CONCLUSION

We need go no further.[7] The grim picture, fully developed, reveals that the defendant was fairly tried and lawfully

---

[7] In his appellate briefs, the defendant adverts to a smattering of other issues. Without exception, those issues are insufficiently developed, patently meritless, or both. None of them warrants any extended discussion here.

convicted.  For the reasons elucidated above, the judgment of the district court is

**<u>Affirmed</u>.**

**APPENDIX**

We set forth here the portion of the district court's jury instructions concerning Counts 6 through 57, unlawful distribution of a controlled substance. <u>See</u> 21 U.S.C. § 841(a)(1); 21 C.F.R. § 1306.04(a).

Counts 6 through 57, unlawful distribution of a controlled substance.  In Counts 6 through 57, the Government alleges that on 51 separate occasions, Dr. Sabean provided prescriptions for controlled substances for other than legitimate medical purposes outside the usual course of professional practice.

For you to find the defendant guilty of any of these charges, you must be satisfied that the Government has proven each of the following things beyond a reasonable doubt:

First, that on or about the date alleged in the count, the charge, the defendant distributed a controlled substance by providing a prescription for

that controlled substance.

Second, that the prescription was not given for a legitimate medical purpose in the usual course of professional practice; and

Third, that he did it knowingly and intentionally.

For purposes of these instructions, I instruct you that Ambien, Alprazolam and Lunesta are all controlled substances under federal law.

To "distribute" means to deliver a controlled substance to another person with or without any financial interest in the transaction. The Government does not have to prove that the defendant distributed the controlled substance directly. Rather, a properly licensed medical practitioner who gives somebody a prescription for a controlled substance has distributed a controlled substance in violation of federal law if he issues the prescription for other than a legitimate medical purpose outside the usual course of professional practice. The prescription is enough if it meets the rest of the criteria.

A controlled substance is prescribed by a physician for a legitimate medical purpose in the usual course of professional practice if the substance is prescribed by him in good faith as part of his medical treatment of a patient.

Good faith in this context means the honest exercise of professional judgment as to the patient's needs.  It also means the defendant made a sincere effort to act in accordance with proper medical practice given the accepted standards in the United States at the time the doctor acted.

In determining whether or not Dr. Sabean acted in good faith, you may consider all of the evidence in this case which relates to that conduct.  This includes evidence regarding ethical standards and the standard of care.  However, I caution you that this is not a civil case involving medical negligence for which a person may recover monetary damages.  Here we're talking about whether the evidence establishes beyond a reasonable doubt that the physician -- that violated his obligation under federal law to prescribe a controlled substance for a legitimate medical purpose in the course of professional practice.

Now, as used in this instruction, the word "knowingly" means the act was done knowingly and intentionally and not by mistake or accident.  In deciding whether the defendant acted knowingly, you may infer that the defendant had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise would have been obvious to him.  You

remember I gave you this earlier on a different charge. Same thing applies here.

In order to infer knowledge, you must find that two things have been established. First, the defendant was aware to a high probability the prescription was not given for a legitimate medical purpose in the usual course of professional practice; second, that the defendant consciously and deliberately avoided learning that fact; that is to say, he willfully made himself blind to that fact. It's entirely up to you to decide whether he deliberately closed his eyes to this fact and, if so, what inference, if any, should be drawn.

However, it's important to bear in mind, again, that mere negligence, recklessness or mistake in failing to learn a fact is not enough. There must be a deliberate effort to remain ignorant of the fact.

In this case, again, evidence has been presented that the defendant suffered from an abnormal mental condition. It's for you to decide whether the defendant, in fact, had this abnormal mental condition. If you find that he suffered from such a mental condition, you may consider whether the condition is inconsistent with acting knowingly.

If, after considering all of the evidence related to defendant's abnormal mental condition, together with

all the other evidence, you have a reasonable doubt that he acted knowingly you should find the defendant not guilty.

I remind you, again, that it is the Government's burden to prove all of the elements of each charge beyond a reasonable doubt. If you have a reasonable doubt as to whether the defendant knowingly issued a particular prescription for other than a legitimate medical purpose in the usual course of professional practice, you must find the defendant not guilty on that particular count.