In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-3152

DAN WILLIAMS,

*Plaintiff-Appellant,*

*v.*

BOARD OF EDUCATION OF THE
CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-11467 — **Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 25, 2020 — DECIDED DECEMBER 8, 2020

Before RIPPLE, BRENNAN, and ST. EVE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Dan Williams brought this action against his employer, the Board of Education of the City of Chicago ("Board"), under the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12101 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. He alleged that the Board had discriminated against him because of his disability and gender, otherwise failed to accommo-

date his disability, and unlawfully retaliated against him for filing claims under Title VII and the ADA. After discovery, the Board moved for summary judgment on all claims. The district court granted the motion,[1] and Mr. Williams timely appealed.[2] We affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Mr. Williams's contentions derive from a rather complicated series of interactions between him and the Board. We therefore begin by setting forth, in approximate chronological order, the essential facts underlying his contentions.

Mr. Williams has worked as a school social worker in the Chicago Public Schools ("CPS") since 2008. He suffers from depression, anxiety, and chronic sinusitis. These conditions make it difficult for him to sleep at night, and, consequently, make it difficult for him to concentrate and recall information.

Teachers and social workers in the CPS are evaluated according to the "REACH" tool. REACH evaluation scores range from 100–400: a score of 340–400 translates to an "excellent" rating, a score of 285–339 translates to a "proficient" rating, a score of 210–284 translates to a "developing" rating, and a score of 100–209 translates to an "unsatisfactory" rating. For the 2013–14 school year, Mr. Williams received a

---

[1] The jurisdiction of the district court is premised on 28 U.S.C. § 1331.

[2] Our jurisdiction is secure under 28 U.S.C. § 1291.

REACH score of 268, which placed him in the "developing" category. Because of this rating, Mr. Williams and the Board developed and signed a Professional Development Plan in December 2014.

CPS selects certain social workers to be Social Work Leads. These individuals support other social workers by assisting with scheduling and covering a caseload when a social worker is absent. This designation does not constitute a promotion, nor does it involve a salary increase. CPS only considers social workers who have attained a "proficient" rating for these duties. In September 2014, Mr. Williams applied to be, but was not selected as, a Social Work Lead.

Most social workers in the CPS are assigned simultaneously to two or three schools. Because CPS schools have different start times, social workers also start their days at different times, depending on which school they are serving on a given day. In October 2014, Mr. Williams made his first accommodation request: he asked the Board to allow him a consistent start time, 7:45 a.m., and a consistent end time, 2:45 p.m., to his workday. The Board denied his request on the ground that there was insufficient medical information to support his request. Nevertheless, it offered to arrange for Mr. Williams to arrive at one of his assigned schools at 7:45 a.m., even though it had an 8:45 a.m. start time.

Throughout the 2014–15 school year, Mr. Williams had performance problems. By the end of the year, Mr. Williams was placed on a Performance Improvement Process, which cited numerous deficiencies, including: interrupting a teacher while she was teaching, failing to read a student's individual educational plan before meeting with that student, speaking inappropriately about his personal life and making

numerous personal calls during school hours, and failing to report to work (as well as failing to swipe in and out and failing to work assigned hours). The plan also noted that parents, students, and teachers at Mr. Williams's assigned schools had complained about his conduct and work. Mr. Williams refused to acknowledge receipt of, or to sign, the plan.

CPS selects some social workers to be Social Work Field Instructors to work with CPS social work interns. Like Social Work Leads, selection for these positions does not constitute a promotion or a salary increase. Furthermore, only "proficient" social workers may become Social Work Field Instructors. In April 2015, Mr. Williams applied to be, but was not selected as, a Social Work Field Instructor.

On April 23, 2015, Mr. Williams filed the first of two discrimination charges. His specific complaints centered on the events of the past year that we have just recounted. He alleged that the Board had failed to award him a Social Work Lead position because of his gender, because of his disability, and in retaliation for his request for accommodation. He further alleged that the Board had failed to accommodate him by denying his request for a uniform start time in October 2014. He also asserted that his placement on a Professional Development Plan constituted harassment on the basis of his disability and his gender and in retaliation for his request for accommodation. Finally, he alleged that the Board's failure to select him to be a Social Work Field Instructor was on account of his disability and gender and in retaliation for his request for accommodation.

One month later, just prior to the end of the 2014–15 school year, Mr. Williams submitted a second accommoda-

tion request. He asked for a consistent start time of 7:45 a.m., a reduced caseload of no more than twenty students (later adjusted to the minimum caseload of students), an assignment to a single school, and the removal of Prescott Elementary School from his responsibilities. The Board denied these requests. With respect to the start time of 7:45 a.m., the Board stated that there were no openings at schools with 7:45 a.m. start times, but that it would attempt to place Mr. Williams at a school with a 7:45 a.m. start time for the following school year. It denied Mr. Williams a reduced case load because a review of his caseload revealed no justification for such a reduction. Regarding Mr. Williams's requests to be assigned only one school and not to have to work at Prescott Elementary, the Board denied these requests because each would have resulted in a de facto part-time position. However, for the coming 2015–16 school year, the Board did remove Prescott Elementary School from Mr. Williams's responsibility, and it assigned him to two schools, Lawndale and Leland Elementary Schools, both with 7:45 a.m. start times.

As the new school year began in September 2015, Mr. Williams submitted a third request for accommodation. He asked that each of his assigned schools provide him with a private office and dedicated equipment, specifically: a telephone, a high-capacity laser printer with extra ink, a private fax machine, a large high-resolution monitor, a high-capacity shredder, a high-capacity scanner, a proper desk and swivel chair, and large HEPA filters. He also requested that the Board exempt him from REACH evaluations and that he be granted a life-long waiver of its residency rule. The Board supplied Mr. Williams with HEPA filters,

computer monitors, and access to a private space to meet with students; it denied his other requests.

On Saturdays and during the summer, CPS conducts special education assessments to create plans for students. Two to three assessments are done each day. Most students evaluated are between two-and-a-half and five years old, are bilingual, or attend a private school in Chicago. Each assessment team has a social worker, and CPS gives priority to social workers who are bilingual, have experience with early childhood students, can work at a fast pace, and have attained a rating of "proficient" in their REACH scores. In June 2015, Mr. Williams applied to be on a summer special assessment team, but he was not selected because, among other reasons, he did not have a rating of "proficient" and was not bilingual. In December 2015, he applied for a position with the Saturday assessment team but was not selected.

On December 18, 2015, Mr. Williams filed his second charge of discrimination. He claimed that he had not been selected for the summer assessment team in 2015 because of his disability and in retaliation for requests for accommodation and his previous charge of discrimination. He complained of the Board's failure to grant him the accommodations that he had requested in May and September 2015. He also alleged discrimination and retaliation in the form of a return-to-work restriction and an increased caseload because of his disability and in retaliation for internal requests for accommodation and his external charge of discrimination. Finally, he alleged that the Board's failure to hire him for the Saturday assessment team was both discriminatory and retaliatory.

**B.**

After receiving a right-to-sue letter on both charges, Mr. Williams instituted this action on December 19, 2016. Mr. Williams's Third Amended (and operative) Complaint, filed in May 2018, set forth many of the events recounted above, as well as allegations involving events that occurred in 2017 and 2018. In Count I, Mr. Williams alleged that the Board had discriminated against him on the basis of his gender in violation of Title VII in failing to hire him as a Social Work Lead and in subjecting him to "numerous work place [sic] restrictions and individual assignments intended to scrutinize his job performance from September to December 2014."[3] In Count II, he alleged discrimination on the basis of his disability. The factual bases for this claim were that his informal and formal requests for accommodation had "been either ignored, denied, or addressed with unreasonable, temporary accommodations."[4] The informal and formal accommodation requests were, according to the complaint, made in August 2014, October 2014, May 2015, September 2015, and July 2017. He also alleged that he had not been hired as a Social Work Lead, for summer assessments, or for Saturday assessments; that from September to December 2014, he was subject to "numerous work place [sic] restrictions and individual assignments intended to scrutinize his job performance"; and that from May 2015 to June 2017, he was precluded from returning to work after taking short-term disability leave and was removed from his school

---

[3] R.48 at 11.

[4] *Id.* at 12.

"without explanation or warning."[5] Finally, Count III alleged that the actions listed above were in retaliation for his informal and formal accommodation requests as well as his charges of discrimination with the EEOC.

After discovery, the Board moved for summary judgment on November 16, 2018. Although Mr. Williams's response to the motion was due on December 14, 2018, he failed to respond or to request, in a timely manner, an extension of time. In all, Mr. Williams missed three due dates for his response. On February 5, 2019, Mr. Williams finally filed his late response. The Board objected to Mr. Williams's late filing on numerous grounds, including that his statement of additional facts did not comply with the limits set forth in the local rule.[6] The Board requested that the court deem admitted its own statement of facts. However, the court accepted Mr. Williams's late response and granted him additional time to file a statement of additional facts that complied with the local rules.[7]

---

[5] *Id*. at 13.

[6] Northern District of Illinois Local Rule 56.1(b) provides, in relevant part, that the party opposing a motion for summary judgment "shall serve and file— … (3) a concise response to the movant's statement that shall contain: … (C) a statement … of any additional facts that require the denial of summary judgment …. Absent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered statements of additional facts."

[7] The district court acted within its discretion in doing so. *See, e.g., Allen-Noll v. Madison Area Tech. Coll*., 969 F.3d 343, 349 (7th Cir. 2020) (recognizing a district court's discretion to enforce its local rules).

On the merits, the district court ruled in favor of the Board. It first determined that the Board's failure to select Mr. Williams as a Social Work Lead or a Social Work Field Instructor did not constitute an adverse action under the ADA or Title VII. With respect to participating in summer and Saturday assessments, the district court concluded that Mr. Williams had not produced evidence that he had the necessary qualifications. Turning to Mr. Williams's claim that he was subject to disparate terms and conditions of employment, the court noted that these actions focused primarily on performance reviews that, according to Mr. Williams, were "unjustifiably lower."[8] However, the court observed, the performance evaluations had not been made a part of the record; the evaluations were beyond the scope of Mr. Williams's charges of discrimination; and poor evaluations—without more—did not rise to the level of adverse employment actions.

Concerning Mr. Williams's claim that the Board had not accommodated his requests, the court concluded that Mr. Williams had failed to raise a genuine issue of material fact. The Board had granted some of his requested accommodations, such as a consistent start time. Other accommodations would have required removing another employee from his or her position or restructuring essential job functions, actions that the ADA does not require. Finally, with respect to the remainder of the requested accommodations, Mr. Williams "ha[d] not shown that the accommodations

---

[8] R.96 at 15.

would have allowed him to perform the essential functions of his job."[9]

Turning lastly to Mr. Williams's claims of retaliation, the court noted that Mr. Williams had come forward with "four purported adverse actions."[10] These four actions were: his placement on the Professional Development Plan, his receipt of "a 'pre-disciplinary notice,'" the denial of his accommodation requests, and the "overly harsh and punitive" actions of his supervisor.[11] The court held that none of these actions rose "to the level needed to trigger retaliation liability."[12] The court therefore entered judgment in favor of the Board on all of Mr. Williams's claims. Mr. Williams appealed.

---

[9] *Id*. at 22.

[10] *Id*. at 25.

[11] *Id*. at 25–26.

[12] *Id*. at 25.

## II

## DISCUSSION[13]

---

[13] As an initial matter, Mr. Williams claims that the district court erred in declining to consider allegations of discrimination that post-dated his last charge of discrimination filed on December 18, 2015. The district court did not consider these allegations (or the evidence in support of them) on the ground that "a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC." *Id.* at 16 (quoting *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011)). The court acknowledged that claims could be included if they were "like or reasonably related" to the relevant charge; however, the allegations from 2016 through 2018 did not implicate "the same conduct and … same individuals" and, consequently, were not "reasonably related." *Id.* (quoting *Moore*, 641 F.3d at 257).

Mr. Williams also acknowledges this standard but does not attempt to meet it. The sum of Mr. Williams's argument that later events were related to his charges of discrimination is that "all of [his] claims arose once he began to request reasonable accommodation for his disabilities. Once the EEOC issued 'right to sue letters,' it could no longer expect to investigate the continuing discrimination, harassment and retaliation nor would there be any point in doing so once a federal lawsuit is filed." Appellant's Br. 36. Mr. Williams makes no effort to explain how the events in 2016, 2017, and 2018 involve the same conduct and individuals. The district court therefore was on solid ground in not considering these allegations of discrimination.

Regarding his retaliation claims, Mr. Williams maintains that he was not required to "exhaust the retaliation claims which arose after the filing of his first charge." *Id.* at 37 (relying on *McKenzie v. Ill. Dep't of Trans.*, 92 F.3d 473, 482–83 (7th Cir. 1996)); *see also Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 857 n.11 (7th Cir. 2019). According to Mr. Williams, we therefore should consider all of the allegedly retaliatory acts that occurred after his second charge of discrimination in December 2015.

(continued … )

**A.**

We first examine Mr. Williams's contentions that the Board failed to accommodate his disability. To prevail on a failure to accommodate claim, a plaintiff must prove that "(1) he was a qualified individual with a disability, (2) the [employer] was aware of his disability, and (3) the [employer] failed to reasonably accommodate his disability. Relevant to—and sometimes determinative of—the third element is the employer and employee's respective cooperation 'in an interactive process to determine a reasonable accommodation.'" *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019) (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998)) (citation omitted) (footnote omitted). Although

> the "interactive process" is important, it is a *means* for identifying a reasonable accommodation rather than an end in itself. And because the process is not an end in itself, an employer cannot be liable solely for refusing

( … continued)

We are aware that at least one of our sister circuits has interpreted the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), to require a complainant to file a separate charge of discrimination for each discrete act of retaliation. *See, e.g.*, *Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003). However, the Board has not argued that *National Railroad Passenger Corp.* precludes our consideration of the discrete, allegedly retaliatory actions that occurred after December 2015; consequently, we have no occasion to consider the merits of this argument. Therefore, in determining whether his retaliation claims should have gone to a jury, we will consider acts that occurred after December 2015 to the extent that they have been properly presented in Mr. Williams's brief and that they find support in the record.

> to take part in it. … Nor will it give rise to a claim against an employer who reasonably accommodated the employee.

*Id*. at 979–80 (emphasis added) (citations omitted).

## 1.

Mr. Williams first submits that he presented sufficient evidence to permit a jury to conclude that the Board had failed to accommodate his October 2014 request for accommodation.[14] The Board does not contest that Mr. Williams was a qualified individual with a disability, nor does it contest that it knew of his disability. The only question is whether the Board failed to accommodate this request, which asked for a consistent start and end time to his workday.

As we already have noted, the Board denied the request, but allowed Mr. Williams to arrive at both of his assigned schools at 7:45 a.m.[15] Mr. Williams admits that he "never requested a shortened workday, just a consistent start time."[16] Consequently, it is difficult to see how the Board's allowing him to arrive early at one of his assigned schools, so that he would have a consistent morning routine, did not satisfy Mr. Williams's needs. *See generally EEOC v. Sears, Roebuck & Co*., 417 F.3d 789, 802 (7th Cir. 2005) (noting that "[i]t is the

---

[14] Mr. Williams does not address his accommodation requests one-by-one; however, given that they were discrete requests, and the Board responded to each individually, we will do the same.

[15] *See* R.74-4 at 12.

[16] Appellant's Br. 18.

employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests" (quoting *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000))).[17]

Mr. Williams also maintains that the Board failed to engage in a good-faith interactive process. He notes that, in its denial of his request,[18] the Board stated that it had contacted Mr. Williams's healthcare provider and that, "based on the limited medical information currently available, the EOCO [Office of Employee Engagement Equal Opportunity Compliance Office] has determined that there is not enough information to support your request for a fixed schedule."[19] Mr. Williams maintains that there is a genuine issue of material fact as to whether his healthcare professionals provided sufficient information to support the accommodation request because "[e]ach of [his] doctors denied that they had ever spoken to anyone at the Board regarding a request for

---

[17] Mr. Williams nevertheless maintains that the district court erred in concluding that he had not set forth a prima facie case of failure to accommodate. He submits that the district court "implied … that [his] depression and anxiety did not substantially limit his ability to work." *Id*. at 16. However, neither the Board nor the district court ever questioned that Mr. Williams's depression qualified as a disability. Instead, the Board argued that Mr. Williams had not come forward with evidence that established that the requested accommodations would help him perform the essential functions of his job. The district court was persuaded by this argument, as are we. *See infra* at 18–19.

[18] *See* R. 74-4 at 11–13.

[19] *Id*. at 12.

accommodation."[20] However, our examination of Mr. Williams's support for this assertion, the declarations of each of Mr. Williams's healthcare providers, reveals that none of these providers started treating Mr. Williams until *after* the Board's denial of his October 2014 accommodation request.[21] Mr. Williams therefore has not raised a genuine issue of material fact as to the truthfulness of the Board's rationale.

Finally, even if there were a breakdown in the interactive process, that alone does not establish an ADA violation. *Sansone*, 917 F.3d at 979–80. It is only "when a reasonable accommodation was possible and the employer did not offer it, [that] the third element of a 'failure to accommodate' claim turns on the 'interactive process' requirement. In that event, 'responsibility will lie with the party that caused the breakdown.'" *Id.* at 980 (quoting *Sears, Roebuck & Co.*, 417 F.3d at 805). Mr. Williams does not maintain that there were positions open at schools with 7:45 a.m. start times, nor does he suggest another way—apart from offering to let him arrive at both of his schools at 7:45 a.m.—that the Board could have reasonably accommodated his request.

**2.**

In a second accommodation request submitted on May 7, 2015, Mr. Williams asked for a consistent start time of 7:45 a.m. and end time of 2:45 p.m., a reduced caseload of no more than twenty students (later adjusted to the minimum

---

[20] Appellant's Br. 18.

[21] *See* R.89-2 at 2 (Decl. of Robert Grunsten, M.D.); *id*. at 6 (Decl. of Jonathan M. Scott, Psy.D.); *id*. at 10 (Decl. of Dr. Robert Thomas).

caseload of students), an assignment to a single school, and the removal of Prescott Elementary School from his responsibilities. The Board denied these requests. It explained to Mr. Williams that there were no open positions at schools with a 7:45 a.m. start time; it nevertheless pledged to try to place Mr. Williams at 7:45 a.m. start-time schools for the coming 2015–16 school year. With respect to his other requests, the Board explained that each request would result in Mr. Williams's having a part-time schedule. Nevertheless, it pledged to seek a single-school placement for Mr. Williams for the following school year.

Mr. Williams again faults the Board for not engaging in the interactive process. He points specifically to his request that he be assigned "to a single school, preferably Lawndale Elementary."[22] He maintains that the Board responded only that an assignment to Lawndale "would be part-time work based on the number and needs of students. Critically," Mr. Williams continues, "the Board did not address whether another school might have been available."[23] However, the Board *did* consider this possibility and addressed it in the letter denying the requested accommodation: "Regarding assignment to a single school *other than Lawndale*, Ms. Ramos has advised the EOCO that there are no available vacancies at the present time to which you can be reassigned."[24]

---

[22] Appellant's Br. 23 (internal quotation marks omitted).

[23] *Id.*

[24] R.74-4 at 21 (emphasis added).

Mr. Williams further argues that reducing his workload would have been a reasonable accommodation. According to Mr. Williams, other social workers had less of a workload than he did and, therefore, a "full" workload was not a requirement of the job. In support of his assertion, Mr. Williams invites the court's attention to his affidavit, in which he identifies two non-disabled social workers who had reduced workloads: Jasmine Beamon and Kristin Patel.[25]

To establish disability discrimination, a plaintiff may rely on "circumstantial evidence" including "evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). However, the comparators must "be similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel." *Abrego v. Wilkie*, 907 F.3d 1004, 1013 (7th Cir. 2018) (quoting *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (internal quotation marks omitted)). Mr. Williams's comparators (Beamon and Patel), however, were not sufficiently similar; they were Social Work Leads, who had different roles and additional job duties assigned to them (including substituting for social workers on leave and overseeing interns at other schools).[26] Consequently, they were not similarly situated to Mr. Williams.

---

[25] *See* R.90 at 8–9.

[26] *See* R.95-1 at 71 (March 19, 2019 Decl. of Anthony Adamowski, Director of Related Service Providers for the Board's Office of Diverse Learner Supports and Services).

(continued … )

Additionally, the Board is not required to create a light-duty position for an employee with a disability as a reasonable accommodation, unless the "employer has a policy of creating light-duty positions for employees who are occupationally injured"; if that is the case, the employer ordinarily must accord "that same benefit … to an employee with a disability who is not occupationally injured unless the [employer] can show undue hardship." *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017) (quoting EEOC Enforcement Guidance: Workers' Compensation and

---

( … continued)

Later in his brief, Mr. Williams claims that, during the 2017–18 school year, various social workers were permitted "part-time" schedules. However, there is little evidence for Mr. Williams's claims in the record. For instance, he alleges that one of the individuals who was allowed a part-time caseload was Nashonda Griffin-Busch. However, the documentation purportedly supporting this statement mentioned only Veronica Garza. As to Garza, although there was evidence showing that her full-time schedule was divided between three locations and also evidence showing the total number of social work minutes required for each location, *see* R.89-5 at 49–56, it is not at all clear from these documents that—as Mr. Williams claims—Garza "worked a modified schedule," that she worked an "average of 2,737.56 monthly service minutes," or the significance of either of those facts, *see* Appellant's Br. 30.

Mr. Williams also makes various claims that a "social worker was assigned to one school for a monthly average of 733.03 required service minutes," that "Roberta Gannello was also given a modified work schedule when she was undergoing cancer treatment," and that "it was not uncommon for school social workers to 'split' or 'share' caseloads." *Id*. at 31. However, the supporting documentation to which Mr. Williams directs our attention (various pages of R.89-2) either does not address these matters or does not provide sufficient context to evaluate their significance.

the ADA, 2 EEOC Compliance Manual (CCH) ¶ 6905, at 5394 (Sept. 3, 1996), 1996 WL 33161342, at *12). Here, Mr. Williams does not contend that the Board had a policy of creating light-duty positions.

### 3.

In September 2015, Mr. Williams submitted a third request for accommodation. He requested that each school to which he was assigned provide him with a private office and dedicated equipment, specifically a telephone, a high-capacity laser printer with extra ink, a private fax machine, a large high-resolution monitor, a high-capacity shredder, a high-capacity scanner, a proper desk and swivel chair, and large HEPA filters. He also requested that CPS exempt him from REACH evaluations and that he be granted a lifelong waiver of its residency rule. The Board provided Mr. Williams with HEPA filters, larger computer monitors, and access to private spaces to meet with students that were outfitted with a desk (or table) and chair; his other requests were denied.

Mr. Williams again faults the Board for failing to engage in a robust interactive process with respect to his requests. He claims that, if the Board simply had inquired of his physicians why he needed the denied equipment, he or his doctors "could have easily explained why the additional office materials were necessary accommodations."[27] However, Mr. Williams has not established how these requests were

---

[27]Appellant's Br. 24.

reasonable,[28] nor how they would help him accomplish the essential functions of his job.[29] Moreover, despite his claim that he could easily explain the necessity for these specific requests, he has yet to set forth a connection between, for instance, his own dedicated shredder and his disability.[30]

---

[28] *See Majors v. General Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) (recognizing that in order to establish a failure to accommodate claim, the plaintiff bears the initial burden of showing that "the accommodation … is reasonable on its face" (quoting *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002))).

[29] *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014) (rejecting a reasonable accommodation claim when the plaintiff "never identified any limitation related to her disability that [the requested] accommodation would alleviate").

[30] Mr. Williams claims that "[a]ny reasonable person with the most basic understanding of depression and anxiety could 'connect the dots' as to how the fulfillment of [his] requests would allow him to perform his job." Appellant's Br. 15. He relies on *Luckett v. Dart*, No. 14-CV-6089, 2017 WL 3386117, at *11 (N.D. Ill. Aug. 7, 2017), to support his claim that the Board somehow fell short of the mark in failing to recognize the connection. The connection in *Luckett*, however, was markedly clearer: the plaintiff—a correctional worker—sought a transfer to a position with no inmate contact as an accommodation to his post-traumatic stress disorder, which had been caused by an inmate assault. *Luckett* does not stand for the general proposition that an employer must intuit the connection between a disability and a requested accommodation.

It is not until his reply brief that Mr. Williams attempts to explain the relationship between *some* of his requests and his disability. However, arguments raised for the first time in a reply brief are waived. *United States v. Dvorkin*, 799 F.3d 867, 874 n.16 (7th Cir. 2015).

**B.**

We now turn to Mr. Williams's submission that the Board discriminated against him because of his disability when it did not designate him as a Social Work Lead or a Social Work Field Instructor. The district court granted summary judgment on these claims; it held that the Board's actions in not selecting Mr. Williams for these assignments did not amount to an adverse employment action. According to the district court, the fact that the assignments carried a more prestigious title was not sufficient to establish a discrimination claim.[31]

Mr. Williams now maintains, without citation to the record, that "[t]he customary practice was that the lead or social work field instructor position was an important step towards advancement."[32] This submission cannot carry the day for Mr. Williams; contentions unsupported by the rec-

---

[31] *See* R.96 at 14 (citing *Grayson v. City of Chi.*, 317 F.3d 745, 750 (7th Cir. 2003)).

[32] Appellant's Br. 26. Mr. Williams does state that "three of [his] last four social work managers … were Leads prior to being promoted." *Id.* (internal quotation marks omitted). His support for this claim is his response to the Board's statement of undisputed facts. *See* R.89 at 26. However, looking to that paragraph in Mr. Williams's response, the statement is not supported by any citation to the record.

Mr. Williams also claims that Social Work Field Instructors enjoy more flexibility and prestige. The only document he identifies in support of this claim, however, is the application for the position, which describes it as a "leadership opportunit[y]." R.89-5 at 38. Moreover, "being passed over for what [i]s only a loftier title [i]s not a materially adverse employment action." *Grayson*, 317 F.3d at 750.

ord are forfeited. *Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 538 (7th Cir. 2017) ("Many of those challenges are wholly unsupported by developed argument citing the record and supporting authority, and are thus forfeited.").

Mr. Williams further maintains that Social Work Leads are assigned significantly fewer Health Service Management Program monthly compliance minutes. Mr. Williams does not explain what this requirement is or the significance of this requirement for school social workers. However, we understand the requirement generally to be a measure of assigned workload and further understand Mr. Williams's argument to be that Social Work Lead positions are desirable because they entail a reduced workload. The record, however, does not support this claim. In addition to their assigned school responsibilities, Social Work Leads "provide support[] to other CPS social workers by assisting with scheduling, grouping students, and covering a caseload when a social worker is absent."[33] Mr. Williams has not come forward with any evidence that, when these additional duties are accounted for, Social Work Leads work fewer hours than social workers do.

## C.

Mr. Williams also submits that a jury could conclude that he suffered discrimination on the basis of his disability when CPS declined to hire him for its Saturday or summer assessment teams in June 2015 and December 2015. In responding to this contention, the Board stresses that, in choosing social

---

[33] R.74 ¶58.

workers for the assessment teams, it gives priority to those who are (a) bilingual; (b) have experience with early childhood students; (c) able to work at a fast pace; and (d) have achieved at least a "proficient" rating.[34]

Mr. Williams disputes that he is unable to work at a fast pace; he also claims that he has experience with early childhood students.[35] He does not claim to be bilingual. Moreover, when he was denied these opportunities, Mr. Williams had not obtained a rating of "proficient," and he has not come forward with any evidence of social workers who were chosen for assessment teams but had not attained that rating. Under these circumstances, a jury could not conclude that the Board's decision was discriminatory.

## D.

Mr. Williams also claims that a jury could conclude that the Board retaliated against him for exercising his rights under the ADA and Title VII. To establish a retaliation claim, a plaintiff can proceed under either a direct or indirect approach. *See Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465,

---

[34] R.74-2 at 35 (November 16, 2018 Decl. of Anthony Adamowski). Mr. Williams produced no evidence to suggest that these were not the Board's priorities; he simply claims that the guidelines were not written down. *See* R.89 at 24.

[35] *See id*. at 25. The only support in the record for Mr. Williams's assertion that he has early childhood experience is his affidavit, which states: "I have early childhood experience and am able to work at a fast pace, perhaps with proper accommodation depending on the circumstances." R.90 at 17. He does not elaborate further on what "early childhood experience" he has.

472 (7th Cir. 2018). Under the direct approach, he must show that "(1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Id*. (quoting *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016)). Under the indirect approach, he "must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id*. (quoting *Boss*, 816 F.3d at 918). Once the plaintiff meets his initial burden, "the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action." *Id*. (quoting *Boss*, 816 F.3d at 918). The plaintiff must then establish that the employer's proffered reason is pretextual. *Id*. For purposes of retaliation claims, "adverse action" encompasses a greater swath of actions than with discrimination claims. An employer's action is materially adverse if it would dissuade a reasonable employee from engaging in the protected activity. *See Koty v. DuPage Cnty.*, 900 F.3d 515, 520 (7th Cir. 2018).

**1**.

Mr. Williams discusses in his opening brief two Board actions that, he claims, were in response to his protected activity. The first is his placement on a Professional Development Plan in December 2014. He notes that his superiors placed him on the Plan, after he made his first accommodation request in October 2014. He further claims that "upon a cursory review … , this Court can see that [the plan] contains al-

most no input from Board administration that would 'assist' anyone in improving their practice."[36]

We have observed that "suspicious timing alone is rarely enough to survive summary judgment particularly when there are reasonable, non-suspicious explanations for the timing" of the adverse employment action. *McCann v. Badger Mining Corp.*, 965 F.3d 578, 592–93 (7th Cir. 2020) (quoting *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (internal quotation marks omitted)). Here, Mr. Williams acknowledges that any teacher who receives a "developing" rating is placed on a Professional Development Plan.[37] Furthermore, Mr. Williams's Professional Development Plan was based on his REACH rating from the 2013–14 school year, which pre-dated his initial (October 2014) request for accommodation. Consequently, Mr. Williams's placement on a Professional Development Plan within a few months of requesting an accommodation is not "suspicious." *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 495–96 (7th Cir. 2014) (explaining that timing of discipline for tardiness was not "suspicious" even though it followed closely on the heels of an accommodation request because employer had taken preliminary, corrective actions prior to the accommodation request).

Mr. Williams's efforts to create "something more" to combine with suspicious timing also fails. The only other evidence of retaliation that Mr. Williams presents is his view

---

[36] Appellant's Br. 34–35.

[37] *See* Reply Br. 7.

that the plan is worthless as a professional development device. He provides no evidentiary support for this assertion; he simply says that the plan's worthlessness is apparent. Such *ipse dixit* simply cannot carry the day. Additionally, contrary to Mr. Williams's assertion, the plan sets forth specific, concrete actions that Mr. Williams must take to improve, including reviewing best practices for individual educational plans, attending training meetings, writing self-reflections, and sharing those self-reflections with the Social Work Coordinator.[38]

**2.**

In his opening brief, Mr. Williams also maintains that his June 2015 Performance Improvement Process was retaliatory because it closely followed his first charge of discrimination in April 2015. However, as Mr. Williams notes, the events precipitating the plan spanned the 2014–15 school year, and the plan was based on an accumulation of incidents over time. To the extent that Mr. Williams suggests that the plan was justified and should have been given to him *before* he filed his charge of discrimination, such an option was not possible given that Mr. Williams was on medical leave from February 11 until May 21, 2015. We have noted already that suspicious timing is rarely sufficient to create a triable issue of fact. Here, that principle is surely applicable given the plausible explanation for why the plan began when it did

---

[38] *See* R.74-2 at 61.

and given that Mr. Williams has produced no other evidence that the plan was based on his disability.[39]

### 3.

Mr. Williams also mentions, in passing, other possible evidence of retaliation. For instance, Mr. Williams maintains that, "[d]espite his accommodation request for a reduced caseload, the Board actually increased his caseload for 2015–2016."[40] In support of this claim, Mr. Williams directs the court to his response to the Board's statement of undisputed facts, in which he identifies the schools to which he was assigned during the 2015–16 school year and states that he

---

[39] Although Mr. Williams sets forth other examples of allegedly retaliatory actions in his reply brief, *see* Reply Br. 19–21, arguments raised for the first time in a reply brief, as we already have noted, are waived, *Dvorkin*, 799 F.3d at 874 n.16. Even if we considered these arguments, however, they would fail. For instance, he alleges that a supervisor gave him an unjustified performance evaluation for the 2015–16 school year. He also alleges that, in 2017–18, a different supervisor increased his average (by minute) monthly caseload by fifty percent. *See* Reply Br. 20. In order to establish a prima facie case of retaliation, Mr. Williams must do more than simply identify the allegedly retaliatory actions; he must establish a causal connection between protected activity and a materially adverse action. *See Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 472 (7th Cir. 2018). However, Mr. Williams merely places these actions later in time than his requests for accommodation and charges of discrimination, which does not, standing alone, raise an inference of retaliation. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020) (noting that "suspicious timing alone is rarely enough to survive summary judgment" (quoting *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) (internal quotation marks omitted))).

[40] Appellant's Br. 31.

"averaged approximately 2,500 direct service minutes per month from September 2015 through May 2016."[41] However, Mr. Williams does not direct us to other critical information necessary to evaluate his claim, namely the number of hours that he had averaged in previous years and the number of hours that other social workers averaged in 2015–16. This information may appear somewhere in Mr. Williams's convoluted filings; however, as we have said on many other occasions, it is not the role of the court to search the record to find support for a party's assertion. *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make [a party's] case for him. 'Judges are not like pigs, hunting for truffles buried in[] the record.'" (quoting *Albrechtsen v. Bd. of Regents of Univ. of Wisc. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002)).

Finally, Mr. Williams maintains that the Board refused to allow him to return to work after being on short-term disability, even though he was medically cleared to do so, resulting in two weeks' lost pay. However, Mr. Williams merely makes this assertion, without any factual or legal support. "We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived …." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).[42]

---

[41] *See* R.89 at 35.

[42] In his reply brief, Mr. Williams raises other allegedly retaliatory actions by the Board that were not mentioned in his opening brief, such as

(continued … )

## CONCLUSION

The district court correctly determined that Mr. Williams has failed to identify a genuine issue of triable fact regarding his disability, gender discrimination,[43] and retaliation claims. Accordingly, the district court's judgment is affirmed.

AFFIRMED

---

( … continued)

his "removal from his Marine Leadership Academy." Reply Br. 19. As with his other arguments that were not mentioned or developed until his reply, these have been waived. *Dvorkin*, 799 F.3d at 874 n.16.

[43] Mr. Williams makes no argument on appeal that any of the allegedly discriminatory actions by the Board were attributable to his gender. Consequently, he has forfeited any gender-based arguments.