In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2783

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM MIKAITIS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 CR 361 — **Virginia M. Kendall**, *Judge.*

ARGUED NOVEMBER 10, 2021 — DECIDED APRIL 29, 2022

Before MANION, ROVNER, and WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* William Mikaitis stood trial on drug charges. The government argued he was a no-show doctor at a weight-loss clinic who participated in illegally distributing drugs. But he denied knowing about illegal activity. The district judge issued a deliberate-avoidance instruction. The jury convicted. The judge sentenced Mikaitis to 30 months. He appeals, arguing that the evidence did not support the instruction. But we affirm.

## I. Facts

Michael Jennings ran Results Weight Loss Clinic in Lombard, Illinois. He was not a doctor or other medical professional. He worked with a doctor to keep Results open, but that doctor lost his license. So Jennings needed another doctor. Someone connected Jennings to Mikaitis, a doctor licensed in Illinois with several decades of experience. They met around October 2012. Mikaitis was working full-time for a hospital in Lockport, Illinois. Jennings offered to pay Mikaitis cash to secure a Drug Enforcement Agency registration number for the clinic and to review patient charts. Mikaitis agreed. So he obtained a DEA number and authorized Jennings to use it and Mikaitis's credit card to order phentermine and other diet medications in bulk to distribute to patients. These diet pills are controlled substances. Over the next two years, Jennings ordered over 530,000 pills for over $84,000 using Mikaitis's credit card and DEA number. Jennings reimbursed Mikaitis for these costs.

The bulk drug shipments Jennings ordered were initially delivered to Mikaitis's Lockport office. But Mikaitis allowed Jennings to take the drugs from Lockport to Results. And Mikaitis changed the delivery address so future shipments went directly to Results.

Jennings saw many patients at Results. Mikaitis appeared weekly to get $1,750 cash and review four to eight charts. He always entered the clinic through a side door, went "right to Mr. Jennings' office" to review the files set aside for him, and "didn't look anywhere in the clinic," according to Mikaitis's testimony. He decided whether to allow drugs based on those charts. But Results also gave drugs—in person and by mail—to many patients whose charts he never reviewed. He testified

he knew Jennings lacked a medical license. Mikaitis testified he never saw any signs the clinic shipped out drugs. But a nurse practitioner who worked at the clinic testified she noticed almost immediately that Jennings was unlawfully distributing drugs. She quit two days after starting.

In all, Jennings paid Mikaitis about $98,000 cash, in addition to reimbursement for over $85,000 in drug costs. Mikaitis deposited most of his weekly cash into a bank account he shared with his mistress, which funded their affair.

## II. Charges and Trial

A grand jury indicted Mikaitis on 17 counts.

Count 1 charged Mikaitis and Jennings with conspiracy "to knowingly and intentionally" distribute benzphentermine, phendimetrazine, and phentermine. Counts 2–8 charged them with "knowingly and intentionally" distributing controlled substances "outside of the usual course of professional practice and without a legitimate medical purpose." Counts 9–15 charged them with misbranding drugs, "with intent to defraud or mislead." Count 16 charged them with conspiracy "to knowingly conduct and attempt to conduct" a financial transaction involving proceeds from drug dealing. Count 17 charged Mikaitis with "knowingly engag[ing] and attempt[ing] to engage in" a monetary transaction involving criminally derived property.

Mikaitis stood trial solo. A key dispute was his *mens rea*. The government had to prove his knowledge. He denied having guilty knowledge. During opening statements, defense counsel explained that as far as Mikaitis understood, the patients would undergo exams to determine if they were fit for drugs, he would review the charts after these exams to

determine if each patient qualified to receive drugs, and no patient would receive drugs without a legitimate medical purpose and his approval. The defense was that Jennings went behind Mikaitis's back and committed crimes without his knowledge.

The government marshaled a parade of nearly 20 witnesses to illegal activity at Results. Yet the theme of cross-examinations was: But you have no idea if Dr. Mikaitis *knew* of any of this alleged illegal activity, do you? For example, an Illinois health services investigator testified about the initial investigation of an anonymous complaint that Jennings acted as a doctor at Results without a license. The investigator determined Jennings was not a medical professional. But cross established that the complaint did *not* mention Mikaitis, that the investigator only saw Jennings give drugs to a patient *outside* Mikaitis's presence, and that the investigator did *not* hear if Jennings ever told Mikaitis about seeing that patient. Defense pressed: "You have no way of knowing … whether Michael Jennings lied to Dr. Mikaitis about what he was doing at that clinic when Dr. Mikaitis wasn't there."

"That's correct, sir."

As another example, a DEA agent testified she entered Results posing as a new patient. Jennings weighed her and took her blood pressure but did not require other tests, conduct an exam, take blood, or discuss her medical history. Yet he sold her a bottle of phentermine. She did not see Mikaitis at Results. But on cross, that was the main point: *she never saw Mikaitis at Results*. She did not hear if Jennings called Mikaitis and mentioned her. She did not know what Jennings told Mikaitis about who completed the forms or who took the blood-pressure information. She admitted she did not know if

Jennings ever reported her visit to Mikaitis or showed him her information.

As yet another example, an actual patient testified that the first time she visited Results, she had her blood pressure and pulse checked and her history reviewed, and got a month's worth of pills. Results did not do an exam, blood work, or any other tests. She returned a few times and found a similar process. After these initial visits, she stopped going in. Instead, she called and gave her blood pressure, weight, and payment. And Results mailed drugs to her. This happened monthly for about two years. She never returned to Results for any checkup. But again, cross suggested she could not implicate Mikaitis. She did not recall ever seeing him at Results and did not know if he was shown her patient file or told about her visits.

Nurse Practitioner Parminder Singh testified. She visited Results as a patient in February 2013. She only saw Jennings and assumed he was a medical provider. He weighed her and took her blood pressure but did no exam or other tests. Yet he gave her drugs. Learning her occupation, he asked her to cover Mikaitis. She agreed. She worked there for two days, in January 2014. She was the provider seeing patients. The only other person there was Jennings. She learned he was taking phone orders and arranging to mail drugs out. She asked about his medical background but he dodged. She realized after the second day he was not a medical provider. She left because staying jeopardized her license. Again, defense blamed Jennings and pursued its ignorance theme during cross. Singh reiterated that when she went to Results as a patient and as an employee, the only other person present with Results was Jennings. He acted as if he was a doctor or nurse practitioner. She never met or spoke with Mikaitis. She did

not know what Jennings told Mikaitis about her resignation. She did not know which charts Jennings showed Mikaitis, or if he signed off on charts, or if Jennings told Mikaitis the truth.

Mikaitis took the stand and maintained his ignorance. Jennings told him he would review the charts before drugs went out. But he admitted Jennings never told him who prepared the charts. Mikaitis never agreed to see patients at Results. He believed Jennings had a nurse practitioner to see patients and prepare charts, but acknowledged Jennings did not *tell* him that. Mikaitis signed for a new nurse practitioner: Singh. Mikaitis believed she would see patients. Jennings never told him she quit. Mikaitis did not know Jennings pretended to be a doctor. Jennings gave the charts to Mikaitis, who relied on Jennings for accuracy. Mikaitis's understanding was that before any patient got drugs, he would have to review the chart and approve. His understanding was no patient would get drugs without his approval. He never would have agreed to allow Jennings to give drugs before he, Mikaitis, had the opportunity to review the patient's history. Mikaitis claimed he had no way to know Jennings' acts outside his presence other than what Jennings told him. Mikaitis testified he did not pay close attention to the volume of pills Jennings ordered.

Mikaitis tried to varnish an incriminating text he sent to Jennings about the mistress picking up the cash one day: "Let her get it. Don't give her any info. She's okay. Better that she knows very little. Thanks. She'll be there by 7." Mikaitis testified he and his mistress were having a disagreement and he did not want her to know the cash amount supplied that time.

The ignorance defense persisted through cross. Mikaitis admitted he knew Jennings was not a doctor or nurse. Mikaitis insisted he "knew nothing about Michael Jennings."

Mikaitis admitted he did not ask Jennings about his medical background, did not interview Singh, and did not know who the nurse practitioner was at Results before her. The prosecutor asked if he ever saw a nurse practitioner at Results. Mikaitis: "I went right to Mr. Jennings' office, and I didn't look anywhere in the clinic."

Mikaitis admitted he did not ask Jennings who dispensed pills. He relied on Jennings. Mikaitis admitted he did not tell his hospital he had outside employment, despite agreeing to get written approval before taking any outside job of that nature. He admitted he did not report the cash on his tax returns. He told his accountant about the income, but he was not sure of the details. Mikaitis did not ensure his tax returns were correct before signing. He admitted his mistress knew how much cash he received weekly. This undermined his explanation about telling Jennings, "Don't give her any info." Mikaitis admitted he never looked at patient files stored and available in the front of the office. He testified he never suspected, during two years, that Jennings was dispensing over 500,000 pills.

On redirect, Mikaitis testified he did not go through the front entrance at Results. Instead, he always entered through the side door, because it was "[c]onvenient." He testified he would not have seen what was going on with the patients when he entered through the side door. He reviewed patient files in Jennings's office. Jennings never said he signed his name as a doctor when Mikaitis was not there or gave a patient drugs before showing the chart to Mikaitis. Jennings never said he shipped drugs without Mikaitis signing off.

As the judge instructed the jury, to support a conviction on Count 1, the government had to prove Mikaitis *knowingly* became a member of the conspiracy with *intent* to advance it.

On Counts 2–8, the government had to prove he *knowingly* distributed controlled substances, and did so outside the usual course of professional practice and not for a legitimate medical *purpose*. On Counts 9–15, the government had to prove he acted with *intent* to defraud or mislead, which includes *knowledge* of the essential nature of the fraud. On Count 16, the government had to prove he *knowingly* joined the conspiracy with *intent* to advance it, and he *knew* the financial transaction involved the proceeds of some form of activity that constitutes a felony. On Count 17, the government had to prove he *knew* the transaction involved criminally derived property.

Over Mikaitis's objection, the judge instructed the jury about deliberate avoidance:

> A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

> You may find that the defendant acted *knowingly* if you find beyond a reasonable doubt that he had a *strong suspicion* that Michael Jennings was distributing controlled substances outside of the usual course of professional practice and without a legitimate medical *purpose* and that he *deliberately took actions to avoid the truth*. You may not find that the defendant acted knowingly if he was merely mistaken or careless in not discovering the truth, or if he failed to make an effort to discover the truth.

(Emphasis added.)

The jury convicted Mikaitis on all counts. He moved for judgment of acquittal or for a new trial. The judge denied his motions and sentenced him to 30 months in prison for each count, to be served concurrently. Mikaitis appeals.

### III. Analysis

On appeal, Mikaitis does not claim the ostrich instruction misstated the law. He only claims that the evidence did not support the instruction. So we review the judge's decision to give the ostrich instruction for abuse of discretion, viewing the evidence in the light most favorable to the government. *United States v. Pierotti*, 777 F.3d 917, 920 (7th Cir. 2015).

Due process requires the government to prove every element of an offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). The government may not satisfy a *mens rea* of knowledge with a showing of mere negligence, indifference, or apathy. "The instruction cannot allow a conviction on the basis of mere negligence because if it did, then it would effectively do away with the mens rea requirement of knowledge, thereby impermissibly relieving the prosecution of its burden of showing every element of the case beyond a reasonable doubt." *United States v. Carrillo*, 435 F.3d 767, 781 (7th Cir. 2006) (cleaned).

A judge should only issue *any* jury instruction "when it addresses an issue reasonably raised by the evidence." *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010). A judge must be cautious in deciding to issue an ostrich instruction because it risks conviction for mere negligence or indifference. *See id.* at 904–05. A properly worded, appropriately given ostrich instruction informs the jury that deliberate avoidance of

knowledge is a form of knowledge at least functionally equivalent to actual knowledge.[1] A judge should only issue an ostrich instruction where (1) defendant claims to lack guilty knowledge and (2) the government presents evidence from which a jury could conclude defendant deliberately avoided the truth. *United States v. Tantchev*, 916 F.3d 645, 653 (7th Cir. 2019).

Prong 1 is rarely at issue on appeal, and is not at issue here. Mikaitis's main defense was lack of guilty knowledge.

Prong 2 is the controversy. We have explained that an ostrich instruction "'should not be given unless there is evidence that the defendant engaged in behavior that could reasonably be interpreted as having been intended to shield him from confirmation of his suspicion that he was involved in criminal activity.'" *United States v. Guzman-Cordoba*, 988 F.3d 391, 407 (7th Cir. 2021) (quoting *United States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015)). In *Macias*, a criminal case about an ostrich instruction, we drew upon the Supreme Court's analysis in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011), a civil case about willful blindness: "As the Supreme Court put it in *Global-Tech* … the defendant must not only 'believe that there is a high probability that a fact exists' but also 'must take deliberate *actions* to avoid learning of that fact' (emphasis added)." *Macias*, 786 F.3d at 1062 (quoting

---

[1] *See United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007) ("Deliberate avoidance is not a standard less than knowledge; it is … another way that knowledge may be proven."); *United States v. Ramsey*, 785 F.2d 184, 188–90 (7th Cir. 1986) ("An ostrich instruction informs the jury that actual knowledge and deliberate avoidance of knowledge are the same thing. … [A] person who has enough knowledge to prompt an investigation [but] avoids further knowledge really does 'know' all that the law requires.").

*Global-Tech*, 563 U.S. at 769); *see also Tantchev*, 916 F.3d at 653 (further assimilating *Global-Tech* into the criminal context).

Relying on *Global-Tech*, Mikaitis argues the ostrich instruction is only appropriate where the government offers some evidence (1) that the defendant subjectively believed there was a high probability that a specific fact existed and (2) that the defendant took some specific, deliberate action to avoid learning that fact. Mikaitis argues the government did not prove either element, so the judge should not have given the ostrich instruction. He maintains the erroneously given instruction supplied an independent basis for conviction and lowered the government's *mens rea* burden.

But here, ample evidence demonstrated (when viewed in the light most favorable to the government) that Mikaitis subjectively believed that there was a high probability he was participating in criminal activity at Results and that he took specific, deliberate actions to avoid learning that fact. Mikaitis buried his head in the sand. He tried to manufacture deniability, like a doctor called in advance to a duel.[2]

From the beginning of his arrangement with Jennings, Results used Mikaitis's DEA number to order and dispense controlled substances. Results did not use any other physician or DEA number during this period. Yet Mikaitis and Jennings arranged that Mikaitis would not see patients.

---

[2] "If they don't reach a peace, that's alright / Time to get some pistols and a doctor on site / You pay him in advance, you treat him with civility / You have him turn around so he can have deniability." Lin-Manuel Miranda et al., "Ten Duel Commandments," *Hamilton: An American Musical*, Act I (2015).

Mikaitis only visited Results once a week. He entered through a side door. He admitted he "went right to Mr. Jennings' office, and … didn't look anywhere in the clinic." He physically avoided seeing Jennings or any other unlicensed person consulting with a patient. He physically avoided the front desk and the file storage. He avoided opening readily available, voluminous patient files that showed Results was dispensing controlled substances without his review and without a physical exam. He avoided evidence of illegal mailings of drugs even though Results mailed out about 2,700 shipments during the scheme. Instead, he merely retrieved cash and reviewed a narrow selection of patient files.

He acted like the defendant in *Diaz*, who absented himself from the crime scene or buried his head under a car hood:

> Here, the trial record contained ample evidence to support the inference that the defendant's *modus operandi* was to insulate himself from the actual drug transaction so that he could deny knowledge of it. During the other observed transactions, he had absented himself from the scene. On this occasion, while present, he argued that he was preoccupied with his disabled vehicle and did not know that he was standing in the middle of his friends' drug transaction. Nor, he submits, did he realize that by raising the automobile's hood, he actually facilitated the transaction. Under these circumstances, it was not error to give the instruction.

*United States v. Diaz*, 864 F.2d 544, 551 (7th Cir. 1988). Likewise, the evidence showed Mikaitis absented himself from Results. He was—in the light most favorable to the government—a "no-show doctor." Despite knowing he was the only doctor with Results, knowing his name and license and DEA

number were on the line, knowing Jennings was not a doctor or nurse, knowing Results was open six days a week, knowing Jennings ordered vast amounts of pills (relative to the scarce files Mikaitis reviewed), knowing these pills are controlled substances, knowing pills kill, and knowing how legitimate medical practices operate given his experience, Mikaitis intentionally absented himself from Results. He only appeared about once a week to review a few charts and collect cash. Sometimes his mistress retrieved the cash.

And even when he went to Results, he intentionally took a physical route allowing him to avoid confronting incriminating facts. He used a side door and went straight to Jennings's office, symbolically burying his head in sand or under a car hood.

Other evidence supporting the instruction involves the initial bulk order under Mikaitis's DEA number. The supplier delivered 40,000 pills to Mikaitis at Advocate in Lockport, where he did not have a weight-loss practice. He allowed Jennings to remove the pills from Lockport. Mikaitis admitted he knew his DEA registration required the pills to be maintained and dispensed from the registration location, and admitted he violated this provision. He redirected the routing so the supplier delivered subsequent orders to Results in Lombard. This supports several reasonable inferences. First, it indicates he subjectively believed there was a high probability Results dealt with large quantities of drugs, significantly exceeding the volume required for the meager number of patients whose charts he reviewed. Second, it indicates he took an affirmative step to reroute deliveries to Lombard, which shielded him from one means of learning further details about the drug quantities.

Further evidence supporting the instruction is the huge quantity of pills involved overall. Mikaitis admitted the supplier sent 530,000 pills on his DEA number during the two or so years he was involved with Results. He admitted that is a lot of pills. Those pills would fill over 17,000 monthly prescription bottles. The jury could infer he saw red flags when comparing the sea of pills to the puddle of pre-selected charts he reviewed. The jury could infer he suspected the meager number of patients whose charts he reviewed could not consume the avalanche of pills ordered on his credit. He told the jury he did not review the number of pills Jennings purchased. But Jennings reimbursed Mikaitis to the tune of about $84,000. And sometimes Mikaitis texted Jennings about these orders and reimbursements. The jury was free to infer Mikaitis monitored Jennings's orders. (Indeed, at oral argument, counsel acknowledged Mikaitis looked at his credit account sometimes.) The jury was free not to believe his denials.

Further support for the instruction is his text to Jennings: "Don't give her any info. … Better that she knows very little." This might suggest Mikaitis had outright knowledge of criminal activity. This inference alone would *not* support the instruction. "[I]f the evidence against the defendant points solely to direct knowledge of the criminal venture, it would be error to give the [ostrich] instruction." *Diaz*, 864 F.2d at 550. But it also raises the reasonable inference he subjectively believed there was a high probability of illegal activity, and took a deliberate, affirmative step to shield himself from the full truth. He kept his head buried in the sand by trying to bury his mistress's head in the sand with his.

Still further evidence indicated Mikaitis tried to hide his affiliation with Results from Advocate and the IRS. He failed

to abide by his agreement to get written approval before entering into outside work of this sort. He did not even tell Advocate about Results. Also, he failed to report his Results cash on his tax returns. This evidence, in the light most favorable to the government, supports the instruction because it allows a reasonable inference that he suspected illegal activity.

Moreover, he failed to ask natural and obvious questions despite his duties. He saw red flag after red flag but deliberately averted his eyes. *See Tantchev*, 916 F.3d at 653. When they met, he did not ask Jennings about his medical background or training.[3] Mikaitis did not ask what happened to the prior doctor. He did not question the cash arrangement. He did not question the volume of prescriptions or the amounts of money. He never talked with Singh. He did not ask who was dispensing drugs or who was qualified to do so. Failure to ask natural and obvious questions can support an ostrich instruction, particularly when he was a doctor with heightened duties. *See United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006) (defendant's failure to inquire despite exposure to red flags obvious to someone with his training and experience showed deliberate avoidance).[4]

Mikaitis relies on *Macias* for the proposition that the government cannot rest on purely psychological avoidance to support an ostrich instruction. But our case is distinguishable.

---

[3] Shortly after admitting this, Mikaitis also admitted he *knew* Jennings had no medical license or training when they entered the partnership.

[4] *See, e.g.*, Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* (The Johns Hopkins Press, 1943) (https://guides.library.jhu.edu/bioethics/codes) ("I will apply dietetic measures for the benefit of the sick according to my ability and judgment; I will keep them from harm and injustice.").

There, defendant moved drug money for a cartel and was charged with participating in a drug conspiracy. But he testified he thought the money came from human smuggling. This made some sense because he worked in human smuggling before. He never asked where the subject money came from. But this was not unnatural because he had no reason or need to know the source, and because there was nothing about the money that would have shown him human smuggling could not have generated it. Moreover, he testified that the person who recruited him for the subject job *told* him the money came from human smuggling. So we reversed on the ground that giving the ostrich instruction was an error. "A total dupe is not a conspirator." *Macias*, 786 F.3d at 1061. We criticized the traditional reliance on "psychological efforts consisting of cutting off one's normal curiosity by an effort of will" as a basis for giving an ostrich instruction. *Id.* at 1063 (cleaned). We bemoaned judges playing psychologists, "folk psychology," and needlessly complicated standards. *Id.* at 1063–64.

In our case, however, Mikaitis was a medical professional with corresponding duties. The jury was free to conclude the red flags were obvious to him. The jury was free to find he suspected the handful of charts he reviewed each week could not have required the vast quantity of pills ordered on his credit and could not have generated the steady stream of cash. As the doctor with his name on the wall and his license and DEA number on the line, he had heightened obligations to inquire. *Macias* explicitly recognized "there indeed are circumstances in which a failure to ask questions is unnatural—a ducking of responsibility, a violation of duty, and perhaps therefore the equivalent of taking evasive action to avoid confirming one's suspicions." *Id.* at 1063. Our case is one of those.

So while *Macias* criticized "psychological efforts consisting of cutting off one's normal curiosity by an effort of will" as a basis for giving an ostrich instruction, *Macias* explicitly carved out our situation. It was well within the judge's discretion (and the jury's ambit) to think Mikaitis's failure to ask questions was unnatural, a ducking of responsibility, a violation of duty, and equivalent to evasive action to avoid confirming suspicions. Mikaitis was not an incurious dupe.

Besides, we need not rely solely on psychological avoidance here, as discussed above. It was well within the judge's discretion to determine the government presented some evidence of physical, outward, affirmative, concrete, deliberate actions and behavior to avoid the truth. And the judge even added "deliberately *took actions* to avoid the truth" to the ostrich instruction to account for arguments about *Macias*.

Mikaitis gave potentially innocent explanations: He did not ask about Jennings's medical background because he thought Jennings had proper personnel. It did not matter to Mikaitis if the pay was cash. He always entered through the side door for convenience. (And his attorney argued there was no evidence Mikaitis altered his route.) Mikaitis was having a "pretty significant disagreement" with his mistress and "didn't want her to know the amount of money that was being supplied." He did not ask who was giving drugs because "Jennings took care of everything" and he "relied on [Jennings] to do the appropriate things." But we view the facts in the light most favorable to the government. To give the instruction, the judge only needed some evidence to support it.

Finally, Mikaitis argues an ostrich instruction can only show *knowledge*, not *purpose*. He contends Counts 2–8 required the government to prove he *knowingly* distributed

drugs outside the usual course of professional practice and not for a legitimate medical *purpose*. But on appeal he forfeited this argument by not developing it or citing any law. *See Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 508 (7th Cir. 2020). Besides, like an ostrich, the argument does not fly.[5]

## IV. Conclusion

The judge did not abuse her discretion in issuing the ostrich[6] instruction. We affirm.

---

[5] *See United States v. Westerfield*, 714 F.3d 480, 485–86 (7th Cir. 2013) ("If the jury found … defendant had a strong suspicion that things were not what they seemed … yet shut her eyes … the jury could conclude [she] acted with the necessary intent.") (cleaned); *United States v. Flaschberger*, 408 F.3d 941, 943 (7th Cir. 2005) (He "had his eyes so tightly shut that the 'ostrich' inference supports a finding of intent to deceive."); *United States v. Caliendo*, 910 F.2d 429, 434–35 n.2 (7th Cir. 1990) (Defendants claimed no knowledge of the activities or *purposes*—"the prototype" for an ostrich instruction.); *United States v. Leonard*, 738 F. App'x 7, 11 (2nd Cir. 2018) (He "either knew or deliberately avoided confirming that he was writing oxycodone prescriptions that were medically unnecessary. [His] challenge to the conscious avoidance instruction is meritless."); *United States v. Sabean*, 885 F.3d 27, 45–46 (1st Cir. 2018).

[6] "They have the marvellous property of being able to digest every substance without distinction, but their stupidity is no less remarkable; for although the rest of their body is so large, they imagine, when they have thrust their head and neck into a bush, that the whole of the body is concealed." Pliny the Elder, *The Natural History*, Book X, Ch. 1, § 1, The Ostrich (77 AD) (Bostock and Riley, 1855) (http://www.perseus.tufts.edu/hopper/text?doc=Perseus%3Atext%3A1999.02.0137%3Abook%3D10%3Achapter%3D1).